**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 15-1335

BELMORA LLC,

        Plaintiff - Appellee,

    v.

BAYER CONSUMER CARE AG, a Swiss corporation; BAYER
HEALTHCARE LLC, a Delaware Limited Liability Company,

        Defendants - Consolidated Plaintiffs - Appellants,

    v.

BELMORA LLC, a Virginia Limited Liability Company; JAMIE
BELCASTRO, an individual; DOES, 1-10, inclusive,

        Consolidated Defendants - Appellees,

    and

MICHELLE K. LEE, Undersecretary for Intellectual Property
and Director of the United States Patent and Trademark
Office (Director),

        Intervenor.

---------------------

AMERICAN INTELLECTUAL PROPERTY LAW ASSOCIATION,

        Amicus Curiae.



Appeal from the United States District Court for the Eastern
District of Virginia, at Alexandria.  Gerald Bruce Lee, District
Judge.  (1:14-cv-00847-GBL-JFA)

Argued: October 27, 2015          Decided: March 23, 2016

---

Before AGEE, FLOYD, and THACKER, Circuit Judges.

---

Vacated and remanded by published opinion. Judge Agee wrote the opinion, in which Judge Floyd and Judge Thacker joined.

---

**ARGUED**: Bradley Louis Cohn, PATTISHALL, MCAULIFFE, NEWBURY, HILLIARD & GERALDSON LLP, Chicago, Illinois, for Appellants. Martin Schwimmer, LEASON ELLIS LLP, White Plains, New York, for Appellee. Lewis Yelin, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Intervenor. **ON BRIEF**: Phillip Barengolts, Andrew R.W. Hughes, PATTISHALL, MCAULIFFE, NEWBURY, HILLIARD & GERALDSON LLP, Chicago, Illinois; Robert J. Shaughnessy, Eric C. Wiener, WILLIAMS & CONNOLLY LLP, Washington, D.C., for Appellants. Craig C. Reilly, Alexandria, Virginia; John L. Welch, WOLF, GREENFIELD & SACKS, P.C., Boston, Massachusetts; Lauren B. Sabol, LEASON ELLIS LLP, White Plains, New York; Rebecca Tushnet, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Appellees. Mark R. Freeman, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Dana J. Boente, United States Attorney, Benjamin C. Mizer, Principal Deputy Assistant Attorney General, OFFICE OF THE UNITED STATES ATTORNEY, Washington, D.C.; Nathan K. Kelley, Solicitor, Christina J. Hieber, Associate Solicitor, Mary Beth Walker, Associate Solicitor, Benjamin T. Hickman, Associate Solicitor, UNITED STATES PATENT AND TRADEMARK OFFICE, Alexandria, Virginia, for Intervenor. Sharon A. Israel, President, AMERICAN INTELLECTUAL PROPERTY LAW ASSOCIATION, INC., Arlington, Virginia; Jennifer L. Kovalcik, STITES & HARBISON, PLLC, Nashville, Tennessee, for Amicus Curiae.

---

AGEE, Circuit Judge:

In this unfair competition case, we consider whether the Lanham Act permits the owner of a foreign trademark and its sister company to pursue false association, false advertising, and trademark cancellation claims against the owner of the same mark in the United States. Bayer Consumer Care AG ("BCC") owns the trademark "FLANAX" in Mexico and has sold naproxen sodium pain relievers under that mark in Mexico (and other parts of Latin America) since the 1970s. Belmora LLC owns the FLANAX trademark in the United States and has used it here since 2004 in the sale of its naproxen sodium pain relievers. BCC and its U.S. sister company Bayer HealthCare LLC ("BHC," and collectively with BCC, "Bayer") contend that Belmora used the FLANAX mark to deliberately deceive Mexican-American consumers into thinking they were purchasing BCC's product.

BCC successfully petitioned the U.S. Trademark Trial and Appeal Board ("TTAB") to cancel Belmora's registration for the FLANAX mark based on deceptive use. Belmora appealed the TTAB's decision to the district court. In the meantime, BCC filed a separate complaint for false association against Belmora under § 43 of the Lanham Act, 15 U.S.C. § 1125, and in conjunction with BHC, a claim for false advertising. After the two cases were consolidated, the district court reversed the TTAB's

3

cancellation order and dismissed the false association and false advertising claims.

Bayer appeals those decisions. For the reasons outlined below, we vacate the judgment of the district court and remand this case for further proceedings consistent with this opinion.

## I. Background

This appeal comes to us following the district court's grant of Belmora's Federal Rule of Civil Procedure 12(b)(6) motion to dismiss Bayer's complaint and Belmora's Rule 12(c) motion for judgment on the pleadings on the trademark cancellation claim. In both circumstances, we "assume all well-pled facts to be true and draw all reasonable inferences in favor of" Bayer as the plaintiff. Cooksey v. Futrell, 721 F.3d 226, 234 (4th Cir. 2013).[1]

### A. The FLANAX Mark

BCC registered the trademark FLANAX in Mexico for pharmaceutical products, analgesics, and anti-inflammatories. It has sold naproxen sodium tablets under the FLANAX brand in Mexico since 1976. FLANAX sales by BCC have totaled hundreds of millions of dollars, with a portion of the sales occurring in

---

[1] We have omitted internal quotation marks, alterations, and citations here and throughout this opinion, unless otherwise noted.

Mexican cities near the United States border. BCC's FLANAX brand is well-known in Mexico and other Latin American countries, as well as to Mexican-Americans and other Hispanics in the United States, but BCC has never marketed or sold its FLANAX in the United States. Instead, BCC's sister company, BHC, sells naproxen sodium pain relievers under the brand ALEVE in the United States market.

Belmora LLC began selling naproxen sodium tablets in the United States as FLANAX in 2004. The following year, Belmora registered the FLANAX mark in the United States. Belmora's early FLANAX packaging (below, left) closely mimicked BCC's Mexican FLANAX packaging (right), displaying a similar color scheme, font size, and typeface.




J.A. 145. Belmora later modified its packaging (below), but the color scheme, font size, and typeface remain similar to that of BCC's FLANAX packaging.



Id.

In addition to using similar packaging, Belmora made statements implying that its FLANAX brand was the same FLANAX product sold by BCC in Mexico. For example, Belmora circulated a brochure to prospective distributors that stated,

> For generations, Flanax has been a brand that Latinos have turned to for various common ailments. Now you too can profit from this highly recognized topselling brand among Latinos. Flanax is now made in the U.S. and continues to show record sales growth everywhere it is sold. Flanax acts as a powerful attraction for Latinos by providing them with products they know, trust and prefer.

J.A. 196. Belmora also employed telemarketers and provided them with a script containing similar statements. This sales script stated that Belmora was "the direct producers of FLANAX in the US" and that "FLANAX is a very well known medical product in the Latino American market, for FLANAX is sold successfully in

6

Mexico." Id. Belmora's "sell sheet," used to solicit orders from retailers, likewise claimed that "Flanax products have been used [for] many, many years in Mexico" and are "now being produced in the United States by Belmora LLC." Id.

Bayer points to evidence that these and similar materials resulted in Belmora's distributors, vendors, and marketers believing that its FLANAX was the same as or affiliated with BCC's FLANAX. For instance, Belmora received questions regarding whether it was legal for FLANAX to have been imported from Mexico. And an investigation of stores selling Belmora's FLANAX "identified at least 30 [purchasers] who believed that the Flanax products . . . were the same as, or affiliated with, the Flanax products they knew from Mexico." J.A. 416.

## B. Proceedings Below

### 1.

In 2007, BCC petitioned the TTAB to cancel Belmora's registration for the FLANAX mark, arguing that Belmora's use and registration of the FLANAX mark violated Article 6bis of the Paris Convention "as made applicable by Sections 44(b) and (h) of the Lanham Act." J.A. 89. BCC also sought cancellation of Belmora's registration under § 14(3) of the Lanham Act because Belmora had used the FLANAX mark "to misrepresent the source of

the goods . . . [on] which the mark is used." Id.; see also Lanham Act § 14(3), 15 U.S.C. § 1064(3).

The TTAB dismissed BCC's Article 6bis claim, concluding that Article 6bis "is not self-executing" and that § 44 of the Lanham Act did not provide "an independent basis for cancellation." J.A. 95. However, the TTAB allowed Bayer's § 14(3) claim to proceed. In 2014, after discovery and a hearing, the TTAB ordered cancellation of Belmora's FLANAX registration, concluding that Belmora had misrepresented the source of the FLANAX goods and that the facts "d[id] not present a close case." J.A. 142. The TTAB noted that Belmora 1) knew the favorable reputation of Bayer's FLANAX product, 2) "copied" Bayer's packaging, and 3) "repeatedly invoked" that reputation when marketing its product in the United States. J.A. 143-45.

**2.**

Shortly after the TTAB's ruling, Bayer filed suit in the Southern District of California, alleging that 1) BCC was injured by Belmora's false association with its FLANAX product in violation of Lanham Act § 43(a)(1)(A), and 2) BCC and BHC were both injured by Belmora's false advertising of FLANAX under § 43(a)(1)(B). The complaint also alleged three claims under California state law.

8

Belmora meanwhile appealed the TTAB's cancellation order and elected to proceed with the appeal as a civil action in the Eastern District of Virginia.[2] It argued that the TTAB erred in concluding that Bayer "had standing and/or a cause of action" under § 14(3) and in finding that Belmora had misrepresented the source of its goods. J.A. 218. Belmora also sought a declaration that its actions had not violated the false association and false advertising provisions of Lanham Act § 43(a), as Bayer had alleged in the California district court proceeding. Bayer filed a counterclaim challenging the TTAB's dismissal of its Paris Convention treaty claims.

The California case was transferred to the Eastern District of Virginia and consolidated with Belmora's pending action. Belmora then moved the district court to dismiss Bayer's § 43(a) claims under Rule 12(b)(6) and for judgment on the pleadings under Rule 12(c) on the § 14(3) claim. On February 6, 2015, after two hearings, the district court issued a memorandum opinion and order ruling in favor of Belmora across the board.

The district court acknowledged that "Belmora's FLANAX . . . has a similar trade dress to Bayer's FLANAX and is

---

[2] A party to a cancellation proceeding who is dissatisfied with the TTAB's decision may either "appeal to" the U.S. Court of Appeals for the Federal Circuit, 15 U.S.C. § 1071(a), or elect to "have remedy by a civil action" in the district court, id. § 1071(b). Belmora chose the latter option.

9

marketed in such a way that capitalizes on the goodwill of Bayer's FLANAX." J.A. 475. It nonetheless "distilled" the case "into one single question":

> Does the Lanham Act allow the owner of a foreign mark that is not registered in the United States and further has never used the mark in United States commerce to assert priority rights over a mark that is registered in the United States by another party and used in United States commerce?

J.A. 476. The district court concluded that "[t]he answer is no" based on its reading of the Supreme Court's decision in Lexmark International, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377 (2014). J.A. 476. Accordingly, the district court dismissed Bayer's false association and false advertising claims for lack of standing. At the same time, it reversed the TTAB's § 14(3) cancellation order.

Bayer filed a timely notice of appeal, and we have jurisdiction under 28 U.S.C. § 1291. The U.S. Patent and Trademark Office ("USPTO") intervened to defend the TTAB's decision to cancel Belmora's registration and to argue that the Lanham Act conforms to the United States' commitments in Article 6bis of the Paris Convention.[3]

---

[3] The district court had agreed with the TTAB that Article 6bis does not create an independent cause of action for the cancellation of Belmora's FLANAX registration. Because Bayer appears to have abandoned its treaty claims on appeal and their resolution is not necessary to our decision, we do not address any issue regarding the Paris Convention arguments.

10

## II. Discussion

We review de novo the district court's decision to dismiss a proceeding under Rules 12(b)(6) and 12(c), accepting as true all well-pleaded allegations in the plaintiff's complaint and drawing all reasonable factual inferences in the plaintiff's favor. Priority Auto Grp., Inc. v. Ford Motor Co., 757 F.3d 137, 139 (4th Cir. 2014); see also Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–56 (2007). In ruling on a motion to dismiss, "a court evaluates the complaint in its entirety, as well as documents attached or incorporated into the complaint." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011).

### A. False Association and False Advertising Under Section 43(a)

The district court dismissed Bayer's false association[4] and false advertising claims because, in its view, the claims failed to satisfy the standards set forth by the Supreme Court in Lexmark. At the core of the district court's decision was its conclusion that 1) Bayer's claims fell outside the Lanham Act's "zone of interests" -- and are not cognizable -- "because Bayer

---

[4] As the district court pointed out, we have sometimes denominated Lanham Act § 43(a)(1)(A) claims as "false designation" claims. We think it preferable to follow the Supreme Court's terminology in Lexmark and instead refer to such claims as those of "false association," although the terms can often be used interchangeably.

does not possess a protectable interest in the FLANAX mark in the United States," J.A. 485, and 2) that a "cognizable economic loss under the Lanham Act" cannot exist as to a "mark that was not used in United States commerce." J.A. 488-89.

On appeal, Bayer contends these conclusions are erroneous as a matter of law because they conflict with the plain language of § 43(a) and misread Lexmark.

**1.**

"While much of the Lanham Act addresses the registration, use, and infringement of trademarks and related marks, § 43(a) . . . goes beyond trademark protection." Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 28-29 (2003). Written in terms of the putative defendant's conduct, § 43(a) sets forth unfair competition causes of action for false association and false advertising:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which --
>
> > (A) [False Association:] is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

12

> (B)  [False  Advertising:]  in  commercial
> advertising  or  promotion,  misrepresents  the
> nature,  characteristics,  qualities,  or  geographic
> origin  of  his  or  her  or  another  person's  goods,
> services,  or  commercial  activities,

> shall  be  liable  in  a  civil  action  by  any  person  who
> believes  that  he  or  she  is  or  is  likely  to  be  damaged
> by  such  act.

Lanham Act § 43(a)(1), 15 U.S.C. § 1125(a)(1).  Subsection A, which creates liability for statements as to "affiliation, connection, or association" of goods, describes the cause of action known as "false association."  Subsection B, which creates liability for "misrepresent[ing] the nature, characteristics, qualities, or geographic origin" of goods, defines the cause of action for "false advertising."

Significantly, the plain language of § 43(a) does not require that a plaintiff possess or have used a trademark in U.S. commerce as an element of the cause of action.  Section 43(a) stands in sharp contrast to Lanham Act § 32, which is titled as and expressly addresses "infringement."  15 U.S.C. § 1114 (requiring for liability the "use in commerce" of "any reproduction, counterfeit, copy, or colorable imitation <u>of a registered mark</u>" (emphasis added)).  Under § 43(a), it is the defendant's use in commerce -- whether of an offending "word, term, name, symbol, or device" or of a "false or misleading description [or representation] of fact" -- that creates the injury under the terms of the statute.  And here the alleged

13

offending "word, term, name, symbol, or device" is Belmora's FLANAX mark.

What § 43(a) does require is that Bayer was "likely to be damaged" by Belmora's "use[] in commerce" of its FLANAX mark and related advertisements. The Supreme Court recently considered the breadth of this "likely to be damaged" language in Lexmark, a false advertising case arising from a dispute in the used-printer-cartridge market. 134 S. Ct. at 1383, 1388. The lower courts in Lexmark had analyzed the case in terms of "prudential standing" -- that is, on grounds that are "prudential" rather than constitutional. Id. at 1386. The Supreme Court, however, observed that the real question in Lexmark was "whether Static Control has a cause of action under the statute." Id. at 1387. This query, in turn, hinged on "a straightforward question of statutory interpretation" to which it applied "traditional principles" of interpretation. Id. at 1388. As a threshold matter, the Supreme Court noted that courts must be careful not to import requirements into this analysis that Congress has not included in the statute:

> We do not ask whether in our judgment Congress should have authorized Static Control's suit, but whether Congress in fact did so. Just as a court cannot apply its independent policy judgment to recognize a cause of action that Congress has denied, it cannot limit a cause of action that Congress has created merely because 'prudence' dictates.

14

Id. The Court concluded that § 43(a)'s broad authorization --
permitting suit by "any person who believes that he or she is or
is likely to be damaged" -- should not be taken "literally" to
reach the limits of Article III standing, but is framed by two
"background principles," which may overlap. Id.

First, a plaintiff's claim must fall within the "zone of
interests" protected by the statute. Id. The scope of the zone
of interests is not "especially demanding," and the plaintiff
receives the "benefit of any doubt." Id. at 1389. Because the
Lanham Act contains an "unusual, and extraordinarily helpful"
purpose statement in § 45, identifying the statute's zone of
interests "requires no guesswork." Id. Section 45 provides:

> The intent of this chapter is to regulate commerce
> within the control of Congress by making actionable
> the deceptive and misleading use of marks in such
> commerce; to protect registered marks used in such
> commerce from interference by State, or territorial
> legislation; to protect persons engaged in such
> commerce against unfair competition; to prevent fraud
> and deception in such commerce by the use of
> reproductions, copies, counterfeits, or colorable
> imitations of registered marks; and to provide rights
> and remedies stipulated by treaties and conventions
> respecting trademarks, trade names, and unfair
> competition entered into between the United States and
> foreign nations.

Lanham Act § 45, 15 U.S.C. § 1127.[5]

---

[5] In the same section, the Lanham Act defines "commerce" as
"all commerce which may lawfully be regulated by Congress."
Lanham Act § 45, 15 U.S.C. § 1227. We have previously construed
this phrase to mean that the term is "coterminous with that
(Continued)

15

The Supreme Court observed that "[m]ost of the enumerated purposes are relevant to a false-association case," while "a typical false-advertising case will implicate only the Act's goal of 'protecting persons engaged in commerce within the control of Congress against unfair competition.'" Lexmark, 134 S. Ct. at 1389. The Court concluded "that to come within the zone of interests in a suit for false advertising under [§ 43(a)], a plaintiff must allege an injury to a commercial interest in reputation or sales." Id. at 1390.

The second Lexmark background principle is that "a statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of the statute." Id. The injury must have a "sufficiently close connection to the conduct the statute prohibits." Id. In the § 43(a) context, this means "show[ing] economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." Id. at 1391.

_____

commerce that Congress may regulate under the Commerce Clause of the United States Constitution." Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Etrangers a Monaco, 329 F.3d 359, 363-64 (4th Cir. 2003). "Commerce" in Lanham Act context is therefore an expansive concept that "necessarily includes all the explicitly identified variants of interstate commerce, foreign trade, and Indian commerce." Id. at 364 (citing U.S. Const. art. I, § 8, cl.3); see also infra n.6).

16

The primary lesson from Lexmark is clear: courts must interpret the Lanham Act according to what the statute says. To determine whether a plaintiff, "falls within the class of plaintiffs whom Congress has authorized to sue," we "apply traditional principles of statutory interpretation." Id. at 1387. The outcome will rise and fall on the "meaning of the congressionally enacted provision creating a cause of action." Id. at 1388.

We now turn to apply these principles to the case before us.

**2.**

**a.**

We first address the position, pressed by Belmora and adopted by the district court, that a plaintiff must have initially used its own mark in commerce within the United States as a condition precedent to a § 43(a) claim. In dismissing BCC's § 43(a) claims, the district court found dispositive that "Bayer failed to plead facts showing that it used the FLANAX mark in commerce in [the] United States." J.A. 487. Upon that ground, the district court held "that Bayer does not possess a protectable interest in the [FLANAX] mark." Id.

As noted earlier, such a requirement is absent from § 43(a)'s plain language and its application in Lexmark. Under

17

the statute, the <u>defendant</u> must have "use[d] in commerce" the offending "word, term, name, [or] symbol," but the <u>plaintiff</u> need only "believe[] that he or she is or is likely to be damaged by such act." Lanham Act § 43(a), 15 U.S.C. § 1125(a).

It is important to emphasize that this is an unfair competition case, not a trademark infringement case. Belmora and the district court conflated the Lanham Act's infringement provision in § 32 (which authorizes suit only "by the registrant," and thereby requires the plaintiff to have used its own mark in commerce) with unfair competition claims pled in this case under § 43(a). Section 32 makes clear that Congress knew how to write a precondition of trademark possession and use into a Lanham Act cause of action when it chose to do so. It has not done so in § 43(a). See <u>Russello v. United States</u>, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

Given that <u>Lexmark</u> advises courts to adhere to the statutory language, "apply[ing] traditional principles of statutory interpretation," <u>Lexmark</u>, 134 S. Ct. at 1388, we lack authority to introduce a requirement into § 43(a) that Congress plainly omitted. Nothing in <u>Lexmark</u> can be read to suggest that

18

§ 43(a) claims have an unstated requirement that the plaintiff have first used its own mark (word, term, name, symbol, or device) in U.S. commerce before a cause of action will lie against a defendant who is breaching the statute.

The district court thus erred in requiring Bayer, as the plaintiff, to have pled its prior use of its own mark in U.S. commerce when it is the defendant's use of a mark or misrepresentation that underlies the § 43(a) unfair competition cause of action. Having made this foundational error, the district court's resolution of the issues requires reversal.[6]

Admittedly, some of our prior cases appear to have treated a plaintiff's use of a mark in United States commerce as a

---

[6] Even though the district court's error in transposing § 43(a)'s requirements for a defendant's actions upon the plaintiff skews the entire analysis, the district court also confused the issues by ill-defining the economic location of the requisite unfair competition acts. As noted earlier, supra n.5, a defendant's false association or false advertising conduct under § 43(a) must occur in "commerce within the control of Congress." Such commerce is not limited to purchases and sales within the territorial limits of the United States as the district court seems to imply at times with regard to § 43(a) and § 14(3) claims. See J.A. 483, 506 (as to § 14(3), stating that "Bayer did not use the FLANAX mark in the United States"); J.A. 487 (as to § 43(a), stating that "Bayer failed to plead facts showing that it used the FLANAX mark in commerce in [the] United States"). Instead, as we explained in International Bancorp, Lanham Act "commerce" includes, among other things, "foreign trade" and is not limited to transactions solely within the borders of the United States. Int'l Bancorp, 329 F.3d at 364. Of course, any such "foreign trade" must satisfy the Lexmark "zone of interests" and "proximate cause" requirements to be cognizable for Lanham Act purposes.

19

prerequisite for a false association claim. See Lamparello v. Falwell, 420 F.3d 309, 313 (4th Cir. 2005) ("Both infringement [under § 32] and false designation of origin [under § 43(a)] have [the same] five elements."); People for the Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 364 (4th Cir. 2001) (same); Int'l Bancorp, 329 F.3d 361 n.2 ("[T]he tests for trademark infringement and unfair competition . . . are identical."); Lone Star Steakhouse & Saloon v. Alpha of Va., Inc., 43 F.3d 922, 930 (4th Cir. 1995) ("[T]o prevail under §§ 32(1) and 43(a) of the Lanham Act for trademark infringement and unfair competition, respectively, a complainant must demonstrate that it has a valid, protectible trademark[.]"). However, none of these cases made that consideration the ratio decidendi of its holding or analyzed whether the statute in fact contains such a requirement. See, e.g., 5 J. Thomas McCarthy, Trademarks and Unfair Competition § 29:4 (4th ed. 2002) (observing that International Bancorp merely "assumed that to trigger Lanham Act § 43(a), the plaintiff's mark must be 'used in commerce'"). Moreover, all of these cases predate Lexmark, which provides the applicable Supreme Court precedent interpreting § 43(a). See U.S. Dep't of Health & Human Servs. v. Fed. Labor Relations Auth., 983 F.2d 578, 581 (4th Cir. 1992) ("A decision by a panel of this court, or by the court sitting

20

en banc, does not bind subsequent panels if the decision rests on authority that subsequently proves untenable.").

Although the plaintiffs' use of a mark in U.S. commerce was a fact in common in the foregoing cases, substantial precedent reflects that § 43(a) unfair competition claims come within the statute's protectable zone of interests without the preconditions adopted by the district court and advanced by Belmora. As the Supreme Court has pointed out, § 43(a) "goes beyond trademark protection." Dastar Corp., 539 U.S. at 29. For example, a plaintiff whose mark has become generic –- and therefore not protectable –- may plead an unfair competition claim against a competitor that uses that generic name and "fail[s] adequately to identify itself as distinct from the first organization" such that the name causes "confusion or a likelihood of confusion." Blinded Veterans Ass'n v. Blinded Am. Veterans Found., 872 F.2d 1035, 1043 (D.C. Cir. 1989); see also Kellogg Co. v. Nat'l Biscuit Co., 305 U.S. 111, 118-19 (1938) (requiring the defendant to "use reasonable care to inform the public of the source of its product" even though the plaintiff's "shredded wheat" mark was generic and therefore unprotectable); Singer Mfg. Co. v. June Mfg. Co., 163 U.S. 169, 203-04 (1896) (same, for "Singer" sewing machines).

21

Likewise, in a "reverse passing off" case, the plaintiff need not have used a mark in commerce to bring a § 43(a) action.[7] A reverse-passing-off plaintiff must prove four elements: "(1) that the work at issue originated with the plaintiff; (2) that origin of the work was falsely designated by the defendant; (3) that the false designation of origin was likely to cause consumer confusion; and (4) that the plaintiff was harmed by the defendant's false designation of origin." Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc., 618 F.3d 417, 438 (4th Cir. 2010). Thus, the plaintiff in a reverse passing off case must plead and prove only that the work "originated with" him -- not that he used the work (which may or may not be associated with a mark) in U.S. commerce. Id.

The generic mark and reverse passing off cases illustrate that § 43(a) actions do not require, implicitly or otherwise, that a plaintiff have first used its own mark in United States commerce. If such a use were a condition precedent to bringing a § 43(a) action, the generic mark and reverse passing off cases could not exist.

---

[7] Reverse passing off occurs when a "producer misrepresents someone else's goods or services as his own," in other words, when the defendant is selling the plaintiff's goods and passing them off as originating with the defendant. Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc., 618 F.3d 417, 438 (4th Cir. 2010) (quoting Dastar Corp., 539 U.S. at 28 n.1).

22

In sum, the Lanham Act's plain language contains no unstated requirement that a § 43(a) plaintiff have used a U.S. trademark in U.S. commerce to bring a Lanham Act unfair competition claim. The Supreme Court's guidance in Lexmark does not allude to one, and our prior cases either only assumed or articulated as dicta that such a requirement existed. Thus, the district court erred in imposing such a condition precedent upon Bayer's claims.[8]

As Bayer is not barred from making a § 43(a) claim, the proper Lexmark inquiry is twofold. Did the alleged acts of unfair competition fall within the Lanham Act's protected zone of interests? And if so, did Bayer plead proximate causation of

---

[8] A plaintiff who relies only on foreign commercial activity may face difficulty proving a cognizable false association injury under § 43(a). A few isolated consumers who confuse a mark with one seen abroad, based only on the presence of the mark on a product in this country and not other misleading conduct by the mark holder, would rarely seem to have a viable § 43(a) claim.

The story is different when a defendant, as alleged here, has -- as a cornerstone of its business -- intentionally passed off its goods in the United States as the same product commercially available in foreign markets in order to influence purchases by American consumers. See M. Kramer Mfg. Co. v. Andrews, 783 F.2d 421, 448 (4th Cir. 1986) ("[E]vidence of intentional, direct copying establishes a prima facie case of secondary meaning sufficient to shift the burden of persuasion to the defendant on that issue."). Such an intentional deception can go a long way toward establishing likelihood of confusion. See Blinded Veterans, 872 F.2d at 1045 ("Intent to deceive . . . retains potency; when present, it is probative evidence of a likelihood of confusion.").

a cognizable injury?  We examine the false association and false advertising claims in turn.

**b.**

**i.**

As to the zone of interests, <u>Lexmark</u> advises that "[m]ost of the [Lanham Act's] enumerated purposes are relevant to false-association cases."  134 S. Ct. at 1389.  One such enumerated purpose is "making actionable the deceptive and misleading use of marks" in "commerce within the control of Congress."  Lanham Act § 45, 15 U.S.C. § 1127; <u>see also</u> <u>Two Pesos, Inc. v. Taco Cabana, Inc.</u>, 505 U.S. 763, 784 n.19 (1992) (Stevens, J., concurring) ("Trademark law protects the public by making consumers confident that they can identify brands they prefer and can purchase those brands without being confused or misled.").  As pled, BCC's false association claim advances that purpose.

The complaint alleges Belmora's misleading association with BCC's FLANAX has caused BCC customers to buy the Belmora FLANAX in the United States instead of purchasing BCC's FLANAX in Mexico.  For example, the complaint alleges that BCC invested heavily in promoting its FLANAX to Mexican citizens or Mexican-

24

Americans in border areas.[9] Those consumers cross into the United States and may purchase Belmora FLANAX here before returning to Mexico. And Mexican-Americans may forego purchasing the FLANAX they know when they cross the border to visit Mexico because Belmora's alleged deception led them to purchase the Belmora product in the United States.

In either circumstance, BCC loses sales revenue because Belmora's deceptive and misleading use of FLANAX conveys to consumers a false association with BCC's product. Further, by also deceiving distributors and vendors, Belmora makes its

_____

[9] Bayer alleges in its complaint that:

11. [BCC] has sold hundreds of millions of dollars of its FLANAX medicines in Mexico. This includes substantial sales in major cities near the U.S.-Mexico border.

12. [BCC] has spent millions of dollars promoting and advertising the FLANAX brand in Mexico, including in major cities near the U.S.-Mexico border.

13. As a result of [BCC's] extensive sales and marketing, the FLANAX brand is extremely well known in Mexico and to Mexican-American consumers in the United States.

. . . .

30. Defendants have marketed Belmora's FLANAX products by targeting Hispanic consumers likely to be familiar with [BCC's] FLANAX products and deliberately attempting to deceive those consumers into believing that Belmora's FLANAX products are the same thing as the FLANAX medicines they know and trust from Mexico.

J.A. 156, 159 (Compl. ¶¶ 11-13, 30).

25

FLANAX more available to consumers, which would exacerbate BCC's losses. See J.A. 196 (stating in a brochure for distributors that "Flanax is now made in the U.S." and "acts as a powerful attraction for Latinos"); J.A. 410 (noting a distributor's concern that the product "is legal to sell in the US"). In each scenario, the economic activity would be "within the control of Congress" to regulate. Lanham Act § 45, 15 U.S.C. § 1127.

We thus conclude that BCC has adequately pled a § 43(a) false association claim for purposes of the zone of interests prong. Its allegations reflect the claim furthers the § 45 purpose of preventing "the deceptive and misleading use of marks" in "commerce within the control of Congress."

## ii.

Turning to Lexmark's second prong, proximate cause, BCC has also alleged injuries that "are proximately caused by [Belmora's] violations of the [false association] statute." 134 S. Ct. at 1390. The complaint can fairly be read to allege "economic or reputational injury flowing directly from the deception wrought by the defendant's" conduct. Id. at 1391. As previously noted, BCC alleges "substantial sales in major cities near the U.S.-Mexico border" and "millions of dollars promoting and advertising" its FLANAX brand in that region. J.A. 156 (Compl. ¶¶ 11-12). Thus, BCC may plausibly have been damaged by

26

Belmora's alleged deceptive use of the FLANAX mark in at least two ways. As reflected in the zone of interests discussion, BCC FLANAX customers in Mexico near the border may be deceived into foregoing a FLANAX purchase in Mexico as they cross the border to shop and buy the Belmora product in the United States. Second, Belmora is alleged to have targeted Mexican-Americans in the United States who were already familiar with the FLANAX mark from their purchases from BCC in Mexico. We can reasonably infer that some subset of those customers would buy BCC's FLANAX upon their return travels to Mexico if not for the alleged deception by Belmora. Consequently, BCC meets the Lexmark pleading requirement as to proximate cause.

BCC may ultimately be unable to prove that Belmora's deception "cause[d] [these consumers] to withhold trade from [BCC]" in either circumstance, Lexmark, 134 S. Ct. at 1391, but at the initial pleading stage we must draw all reasonable factual inferences in BCC's favor. Priority Auto Grp., 757 F.3d at 139. Having done so, we hold BCC has sufficiently pled a § 43(a) false association claim to survive Belmora's Rule 12(b)(6) motion. The district court erred in holding otherwise.

**c.**

BCC and BHC both assert § 43(a)(1)(B) false advertising claims against Belmora. BHC's claim represents a "typical"

27

false advertising case: it falls within the Act's zone of interests by "protecting persons engaged in commerce within the control of Congress against unfair competition." Lexmark, 134 S. Ct. at 1389 (quoting 15 U.S.C. § 1127). As a direct competitor to Belmora in the United States, BHC sufficiently alleges that Belmora engaged in Lanham Act unfair competition by using deceptive advertisements that capitalized on BCC's goodwill. See J.A. 163 (Compl. ¶ 54) (asserting that Belmora was deceptive with "claims in their marketing materials and communications with distributors"); Appellees' Br. 77 (acknowledging that "BHC is a competitor of Belmora's in the United States naproxen sodium market" and "can in theory bring a false advertising action against a competitor"). If not for Belmora's statements that its FLANAX was the same one known and trusted in Mexico, some of its consumers could very well have instead purchased BHC's ALEVE brand. These lost customers likewise satisfy Lexmark's second prong: they demonstrate an injury to sales or reputation proximately caused by Belmora's alleged conduct.

BCC's false advertising claim is perhaps not "typical" as BCC is a foreign entity without direct sales in the territorial United States. Nonetheless, BCC's claim advances the Act's purpose of "making actionable the deceptive and misleading use of marks." Lanham Act § 45, 15 U.S.C. § 1127. As alleged,

28

Belmora's advertising misrepresents the nature of its FLANAX product in that Belmora implies that product is the same as consumers purchased in Mexico from BCC and can now buy here.

To be sure, BCC's false advertising claim overlaps to some degree with its false association claim, but the two claims address distinct conduct within the two subsections of § 43(a). Belmora's alleged false statements go beyond mere claims of false association; they parlay the passed-off FLANAX mark into misleading statements about the product's "nature, characteristics, qualities, or geographic origin," all hallmarks of a false advertising claim. Lanham Act 43(a)(1)(B), 15 U.S.C. 1125(a)(1)(B).[10]

Belmora's alleged false statements intertwine closely with its use of the FLANAX mark. The FLANAX mark denotes history: Belmora claims its product has been "used [for] many, many years in Mexico" and "Latinos have turned to" it "[f]or generations." J.A. 196. FLANAX also reflects popularity: Belmora says the product is "highly recognized [and] top-selling." Id. And FLANAX signifies a history of quality: Belmora maintains that Latinos "know, trust and prefer" the product. Id. Each of these statements by Belmora thus directly relates to the

---

[10] Because each of these claims is anchored as a factual matter to the FLANAX mark's history "in the Latino American market," we disagree with Belmora's argument that the statements amount to mere puffery. See J.A. 160.

29

"nature, characteristics, qualities, or geographic origin" of its FLANAX as being one and the same as that of BCC. Lanham Act § 43(a)(1)(B), 15 U.S.C. § 1125(a)(1)(B). Because these statements are linked to Belmora's alleged deceptive use of the FLANAX mark, we are satisfied that BCC's false advertising claim, like its false association claim, comes within the Act's zone of interests. As we can comfortably infer that the alleged advertisements contributed to the lost border sales pled by BCC, the claim also satisfies Lexmark's proximate cause prong (for the same reasons discussed above regarding the false association claim).

### d.

We thus conclude that the Lanham Act permits Bayer to proceed with its claims under § 43(a) -- BCC with its false association claim and both BCC and BHC with false advertising claims. It is worth noting, as the Supreme Court did in Lexmark, that "[a]lthough we conclude that [Bayer] has alleged an adequate basis to proceed under [§ 43(a)], it cannot obtain relief without evidence of injury proximately caused by [Belmora's alleged misconduct]. We hold only that [Bayer] is entitled to a chance to prove its case." 134 S. Ct. at 1395.

In granting Bayer that chance, we are not concluding that BCC has any specific trademark rights to the FLANAX mark in the

30

United States. Belmora owns that mark. But trademark rights do not include using the mark to deceive customers as a form of unfair competition, as is alleged here. Should Bayer prevail and prove its § 43(a) claims, an appropriate remedy might include directing Belmora to use the mark in a way that does not sow confusion. See Lanham Act § 34(a), 15 U.S.C. § 1116(a) (authorizing injunctions based on "principles of equity"). Of course, the precise remedy would be a determination to be made by the district court in the first instance upon proper evidence.[11] We leave any potential remedy to the district court's discretion should this case reach that point. We only note that any remedy should take into account traditional trademark principles relating to Belmora's ownership of the mark.

## B. Cancellation Under Section 14(3)

The TTAB ordered the cancellation of Belmora's FLANAX trademark under § 14(3), finding that the preponderance of the

---

[11] For example, a remedy might include altering the font and color of the packaging or the "ready remedy" of attaching the manufacturer's name to the brand name. Blinded Veterans, 872 F.2d at 1047. Another option could be for the packaging to display a disclaimer -- to correct for any deliberately created actual confusion. See id. ("The district court could, however, require [Blinded American Veterans Foundation] to attach a prominent disclaimer to its name alerting the public that it is not the same organization as, and is not associated with, the Blinded Veterans Association.").

31

evidence "readily establishe[d] blatant misuse of the FLANAX mark in a manner calculated to trade in the United States on the reputation and goodwill of petitioner's mark created by its use in Mexico." J.A. 142. In reversing that decision and granting Belmora's motion for judgment on the pleadings, the district court found that BCC, as the § 14(3) complainant, "lack[ed] standing to sue pursuant to Lexmark" under both the zone of interests and the proximate cause prongs. J.A. 505. The district court also reversed the TTAB's holding that Belmora was using FLANAX to misrepresent the source of its goods "because Section 14(3) requires use of the mark in United States commerce and Bayer did not use the FLANAX mark in the United States." J.A. 505-06.

On appeal, Bayer argues that the district court erred in overturning the TTAB's § 14(3) decision because it "read a use requirement into the section that is simply not there." Appellants' Br. 49. For reasons that largely overlap with the preceding § 43(a) analysis, we agree with Bayer.

**1.**

Section 14(3) of the Lanham Act creates a procedure for petitioning to cancel the federal registration of a mark that the owner has used to misrepresent the source of goods:

> A petition to cancel a registration of a mark, stating the grounds relied upon, may . . . be filed as follows

32

> by any person who believes that he is or will be damaged . . . by the registration of a mark . . .
>
> . . . .
>
> (3) At any time . . . if the registered mark is being used by, or with the permission of, the registrant so as to misrepresent the source of the goods or services on or in connection with which the mark is used.

Lanham Act § 14(3), 15 U.S.C. § 1064(3). The petitioner must establish that the "registrant deliberately sought to pass off its goods as those of petitioner." See 3 McCarthy, § 20:30 (4th ed. 2002).

If successful, the result of a § 14(3) petition "is the cancellation of a registration, not the cancellation of a trademark." Id. § 20:40. Cancellation of registration strips an owner of "important legal rights and benefits" that accompany federal registration, but it "does not invalidate underlying common law rights in the trademark." Id. § 20:68; see also B & B Hardware Inc. v. Hargis Indus., Inc., 135 S. Ct. 1293, 1300 (2015).

To determine what parties § 14(3) authorizes to petition for cancellation, we again apply the Lexmark framework. The relevant language in § 14(3) closely tracks similar language from § 43(a) that the Supreme Court considered in Lexmark: "[A]ny person who believes that he is or will be damaged" by the mark's registration may petition for cancellation under § 14(3),

33

just as "any person who believes that he or she is or is likely to be damaged" may bring an unfair competition action under § 43(a). The same two-prong inquiry from <u>Lexmark</u> provides the mode of analysis.

To determine if a petitioner falls within the protected zone of interests, we note that § 14(3) pertains to the same conduct targeted by § 43(a) false association actions -- using marks so as to misrepresent the source of goods. Therefore, "[m]ost of the [Lanham Act's] enumerated purposes are relevant" to § 14(3) claims as well. See <u>Lexmark</u>, 134 S. Ct. at 1389. As for proximate cause, we once again consider whether the plaintiff has "show[n] economic or reputational injury flowing directly from the deception wrought by the defendant's [conduct]."[12] <u>Id.</u> at 1391. As with § 43(a), neither § 14(3) nor <u>Lexmark</u> mandate that the plaintiff have used the challenged mark in United States commerce as a condition precedent to its claim. See <u>Empresa Cubana Del Tabaco v. Gen. Cigar Co.</u>, 753 F.3d 1270, 1278 (Fed. Cir. 2014) ("In the proceedings before the Board,

---

[12] The USPTO suggests that § 14(3) might require a lesser showing of causation because it sets forth an <u>administrative</u> remedy, whereas the Supreme Court based its <u>Lexmark</u> analysis on common law requirements for <u>judicial</u> remedies. See <u>Empresa Cubana Del Tabaco v. Gen. Cigar Co.</u>, 753 F.3d 1270, 1275 (Fed. Cir. 2014) ("A petitioner is authorized by statute to seek cancellation of a mark where it has both a real interest in the proceedings as well as a reasonable basis for its belief of damage."). We need not resolve this issue for purposes of the current decision.

however, Cubatabaco need not own the mark to cancel the Registrations under [Section 14(3)].").

**2.**

Applying the framework from <u>Lexmark</u>, we conclude that the Lanham Act authorizes BCC to bring its § 14(3) action against Belmora. BCC's cancellation claim falls within the Lanham Act's zone of interests because it confronts the "deceptive and misleading use of marks." Lanham Act § 45, 15 U.S.C. § 1127. And BCC has also adequately pled a proximately caused injury to survive Belmora's Rule 12(c) motion for the same reasons previously discussed for the false association and false advertising claims. The district court thus erred in reversing the TTAB's decision cancelling the registration of Belmora's FLANAX mark.

**III.**

For the foregoing reasons, we conclude that Bayer is entitled to bring its unfair competition claims under Lanham Act § 43(a) and its cancellation claim under § 14(3). The district court's judgment is vacated and the case remanded for further proceedings consistent with this opinion.

<u>VACATED AND REMANDED</u>

35