# United States Court of Appeals for the Federal Circuit

———————————

**MEENAXI ENTERPRISE, INC.,**
*Appellant*

**v.**

**COCA-COLA COMPANY,**
*Appellee*

———————————

2021-2209

———————————

Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board in Nos. 92063353, 92064398.

———————————

Decided: June 29, 2022

———————————

RICHARD MANDEL, Cowan, Liebowitz & Latman, PC, New York, NY, argued for appellant.

HOLLY HAWKINS SAPORITO, Alston & Bird LLP, Atlanta, GA, argued for appellee. Also represented by KIRK T. BRADLEY, Charlotte, NC.

———————————

Before DYK, REYNA, and STOLL, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* DYK.

Opinion concurring in the result filed by *Circuit Judge* REYNA.

DYK, *Circuit Judge.*

The Coca-Cola Company ("Coca-Cola") distributes a Thums Up cola and Limca lemon-lime soda in India and other foreign markets. Meenaxi Enterprise, Inc. ("Meenaxi") has distributed a Thums Up cola and a Limca lemon-lime soda in the United States since 2008 and registered the THUMS UP and LIMCA marks in the United States in 2012. Coca-Cola brought cancellation proceedings under § 14(3) of the Lanham Act, 15 U.S.C. § 1064(3), asserting that Meenaxi was using the marks to misrepresent the source of its goods. The Trademark Trial and Appeal Board ("Board") held in Coca-Cola's favor and cancelled Meenaxi's marks. Meenaxi appeals. Because we conclude that Coca-Cola has not established a statutory cause of action based on lost sales or reputational injury, we reverse.

BACKGROUND

I

Coca-Cola began operating in India in 1950. Parle (Exports), Limited of Bombay, India ("Parle") introduced the Thums Up cola in India in 1977 and the Limca lemon-lime soft drink in India in 1971. Coca-Cola purchased Parle in 1993 and acquired Parle's Indian registrations of the THUMS UP and LIMCA marks. Coca-Cola's beverages are available in over 2.6 million retail outlets throughout India. Thums Up cola is also sold in Bangladesh, Oman, Singapore, and the United Arab Emirates, and Limca soda is also sold in Angola, Nigeria, Sri Lanka, Bhutan, Oman, Singapore, and the United Arab Emirates. The Indian High Court of Delhi found in 2014 that the THUMS UP mark was "famous" and "well known" in India, J.A. 3165, 3174, and previously found in 2011 that the LIMCA mark was "well known" in India, J.A. 3256, 3258.

Coca-Cola claims that its Thums Up and Limca beverages have been imported and sold in the United States by third parties who purchased the products in India since at least 2005.  Michael Pittman, Marketing Director for Sparkling Brands Platform Innovation at Coca-Cola, stated that authentic "Thums Up and Limca products are resold by third parties in Indian grocery stores, restaurants, and other retail outlets in the U.S."  J.A. 3590 ¶ 15.  Shrenik Dasani, Vice President for the Sparkling Category at Coca-Cola India, stated, "It is my understanding that these THUMS UP-branded and LIMCA-branded products are resold in Indian grocery stores around the world, including in the U.S., and that these brands are extremely popular and well-received by consumers in the U.S. . . . ." J.A. 3055 ¶ 39.  Based primarily on the affidavits of Mr. Pittman and Mr. Dasani, the Board found that there is "an interest in [Coca-Cola's] goods in the United States by Indian grocers, restaurants and other retail outlets." J.A. 37.

Meenaxi has been selling beverages to Indian grocers in the United States since 2008 using the THUMS UP and LIMCA marks.  Prior to beginning use of the marks in 2008, Meenaxi claims to have searched for the mark in the U.S. Patent and Trademark Office ("USPTO") database and in several Indian grocers in the United States.  The USPTO search revealed an application for the THUMS UP mark was abandoned in 1987 and a registration for the LIMCA mark expired in 1996.

In 2012, Meenaxi sought to register the THUMS UP and LIMCA marks in the United States.  It was granted Registration No. 4,205,598 ("'598 Registration") for the THUMS UP standard character mark in International Class 32 for "Colas; Concentrates, syrups or powders used in the preparation of soft drinks; Soft drinks, namely, sodas," and Registration No. 4,205,597 ("'597 Registration") for the LIMCA standard character mark, also in International Class 32.  J.A. 10.

## II

On March 8, 2016, Coca-Cola brought a claim under § 14(3) of the Lanham Act to cancel Meenaxi's registrations for misrepresentation of source. Section 14(3) provides:

> A petition to cancel a registration of a mark, stating the grounds relied upon, may . . . be filed as follows by any person who believes that he is or will be damaged . . . by the registration of a mark on the principal register[:] . . .
>
> (3) At any time . . . if the registered mark is being used by, or with the permission of, the registrant so as to misrepresent the source of the goods or services on or in connection with which the mark is used.

15 U.S.C. § 1064.

The Board first addressed Coca-Cola's statutory entitlement to bring a cancellation claim before reaching the merits. Under the statute, Coca-Cola was required to establish that it "believes that [it] is or will be damaged . . . by the registration of [the] mark." *Id.* Under the Supreme Court's decision in *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129, 132 (2014), entitlement to a statutory cause of action under the Lanham Act requires demonstrating (1) an interest falling within the zone of interests protected by the Lanham Act and (2) an injury proximately caused by a violation of the Act.

Considering the zone-of-interest prong of the statutory entitlement inquiry, the Board found that Coca-Cola owns registrations for the THUMS UP and LIMCA marks in India and other countries and that these marks are well known in India, command a substantial market share in India, and are imported and sold in the United States by others. The Board further found that "the reputation of [Coca-Cola's] THUMS UP and LIMCA beverages would

extend to the United States, at least among the significant population of Indian-American consumers." J.A. 26. This was so because Coca-Cola's THUMS UP and LIMCA marks "likely would be familiar to much of the substantial Indian-American population in the United States." J.A. 37, 40–41. The Board relied on evidence that the Indian-American population in the United States was over 2.6 million in 2010 and had climbed to over 3.8 million by 2015.

Considering the proximate damage prong of the statutory entitlement inquiry, the Board found that Coca-Cola "reasonably believe[d] in damage proximately caused by the continued registration by [Meenaxi] of THUMS UP and LIMCA," as Meenaxi's use of the THUMS UP and LIMCA marks could cause a harm "stemming from the upset expectations of consumers." J.A. 30. The Board also noted that Meenaxi had used its registrations to block importation of Coca-Cola's Thums Up and Limca beverages by third parties. Thus, based on these findings and the Fourth Circuit's decision in *Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697 (4th Cir. 2016), the Board found the zone-of-interest and damage prongs of *Lexmark* met.

On the merits, the Board reiterated that Coca-Cola's THUMS UP and LIMCA marks had reputations that would be familiar to Indian Americans in the United States. And the Board explained that Meenaxi had "admitted knowledge of [Coca-Cola's] marks," J.A. 57, based on evidence that (i) Meenaxi admitted it was aware that "THUMS UP was used in India by an Indian company" in the 1970s, J.A. 44 (citing J.A. 2508); (ii) Meenaxi founder Kaushik Gandhi admitted he had tasted a Thums Up soda in India in the 1980s, J.A. 42 (citing J.A. 2651); (iii) Mr. Gandhi admitted he had "tried the Limca product at [his] college's canteen," J.A. 48 (quoting J.A. 2652); (iv) Meenaxi President Meenaxi Gandhi admitted she was aware of Thums Up and Limca drinks in India, J.A. 42, 49 (citing J.A. 2939–40); and (v) Meenaxi admitted it knew that

"Coca-Cola entered the Indian soda market and purchased THUMS UP sometime in the early 1990s," J.A. 44 (citing J.A. 2508).  The Board found that Meenaxi had intentionally adopted logos and a slogan that were exact or nearly exact replicas of those used by Coca-Cola and only changed the logos once Coca-Cola objected.[1]

Relying on these underlying findings, the Board held that Meenaxi was attempting "to dupe consumers in the United States who were familiar with [Coca-Cola's] THUMS UP cola from India into believing that [Meenaxi's] THUMS UP cola was the same drink," J.A. 46, and that these efforts to deceive satisfied the misrepresentation of source claim.  On June 28, 2021, the Board cancelled the '597 and '598 Registrations.

Meenaxi appeals.    We have jurisdiction under 28 U.S.C. § 1295(a)(4).

---

[1]    The Board also found that Coca-Cola's THUMS UP and LIMCA marks were not the only Indian brands Meenaxi reproduced in the United States as a part of its business model of copying popular Indian brands and products to sell them to Indian-American consumers.  Other Meenaxi marks have been challenged in Board proceedings, which have resulted in cancellation or abandonment. *See* J.A. 3810–20 (Opposition No. 91210494 to Meenaxi's NUTRELA mark, which led to the denial of Meenaxi's application); J.A. 3753–65 (Cancellation No. 92057584 to Meenaxi's RASNA mark, which led to Meenaxi surrendering its registration and the Board cancelling the mark); J.A. 3821–36 (Opposition No. 91211285 to Meenaxi's REAL NAMKEEN mark, which led to Meenaxi abandoning the mark).

## DISCUSSION

### I

As a threshold matter, we must address whether Coca-Cola has a statutory cause of action to challenge Meenaxi's trademark registrations for the THUMS UP and LIMCA marks. *See Austl. Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 1373–74 (Fed. Cir. 2020), *cert. denied*, 142 S. Ct. 82 (2021). Entitlement to a statutory cause of action is a legal determination reviewed de novo. *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 1303 (Fed. Cir. 2020), *cert. denied*, 141 S. Ct. 2671 (2021).[2] Under § 14 of the Lanham Act, a cancellation challenge may be filed "by any person who believes that he is or will be damaged

---

[2]    This appeal focuses on entitlement to a statutory cause of action to cancel a trademark registration under 15 U.S.C. § 1064, not Article III standing. *Corcamore*, 978 F.3d at 1303. This is sometimes called statutory standing. *See Lexmark*, 572 U.S. at 128 n.4.

"The <u>appellant</u> must also satisfy the requirements of Article III." *Brooklyn Brewery Corp. v. Brooklyn Brew Shop*, 17 F.4th 129, 137 (Fed. Cir. 2021) (emphasis added). "[A]lthough Article III standing is not necessarily a requirement to appear before an administrative agency [such as the TTAB], once a party seeks review in a federal court, 'the constitutional requirement that it have standing kicks in.'" *Consumer Watchdog v. Wis. Alumni Rsch. Found.*, 753 F.3d 1258, 1261 (Fed. Cir. 2014) (quoting *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002)). Meenaxi's standing to appeal is not at issue because its trademark registration was cancelled, which it clearly has standing to appeal. Since Coca-Cola is the appellee, the sole issue with respect to Coca-Cola is whether it has a statutory cause of action that permitted it to proceed before the Board.

. . . by the registration of a mark." § 1064. Here, the alleged damage is that "the registered mark is being used by . . . the registrant so as to misrepresent the source of the goods." § 1064(3). In *Lexmark*, the Supreme Court held that such causes of action "extend[] only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked.'" 572 U.S. at 129 (quoting *Allen v. Wright,* 468 U.S. 737, 751 (1984)). That in turn requires an allegation of "injury to a commercial interest in reputation or sales." *Id.* at 132. While the zone-of-interest "test is not especially demanding," *id.* at 130 (internal quotations omitted) (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,* 567 U.S. 209, 225 (2012)), it nonetheless imposes a critical requirement.

*Lexmark* involved activities solely within the United States. In that case, Static Control produced components that remanufacturers could use to refurbish used toner cartridges for Lexmark printers. *Id.* at 121. Lexmark allegedly sent letters to most remanufacturers claiming that "it was illegal to use Static Control's products to refurbish [certain of Lexmark's toner] cartridges," which was an alleged misrepresentation of the legal status of Static Control's products under § 43(a) of the Lanham Act. *Id.* at 122–23. The Court held that Static Control's injury flowing from Lexmark's claims about its products, including "lost sales and damage to its business reputation," were "injuries to precisely the sorts of commercial interests the [Lanham] Act protects" in the Court's zone-of-interest analysis. *Id.* at 137.

The language in § 43(a) at issue in *Lexmark*—establishing entitlement to a cause of action for "any person who believes that he or she is or is likely to be damaged" by prohibited conduct—is very similar to the language of § 14(3)

that applies here.[3]  Given the similar statutory language, we have held that the same requirements as to the injury apply to § 14(3) of the Lanham Act, 15 U.S.C. § 1064, as to § 43(a).  Here, as in *Corcamore*, "[w]e . . . hold that the *Lexmark* zone-of-interests and proximate-causation requirements control the statutory cause of action analysis under § 1064."  978 F.3d at 1305.

Meenaxi argues that Coca-Cola lacks any cause of action under the Lanham Act because of the territoriality principle.  Meenaxi is correct that the territoriality principle is well established in trademark law: "Under the territoriality doctrine, a trademark is recognized as having a separate existence in each sovereign territory in which it is

---

[3]    Section 43(a) prohibits using any mark in commerce that

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities . . . .

15 U.S.C. § 1125(a).  Section 43(a) is meant "to protect consumers from deception caused by both trademark infringement and false advertising."  5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27:25 (5th ed. 2021).  Section 14(3) concerns similar conduct—deception through misrepresentation of source—but it describes a narrower cause of action for cancelling the registration of a mark being used to misrepresent the source of the goods.  *See* § 1064.

registered or legally recognized as a mark." *McCarthy on Trademarks* § 29:1. "The concept of territoriality is basic to trademark law; trademark rights exist in each country solely according to that country's statutory scheme." *Person's Co. v. Christman*, 900 F.2d 1565, 1568–69 (Fed. Cir. 1990).[4]

Supreme Court cases from early in the last century, before the Lanham Act, recognized the territoriality principle both with respect to differing sections of the United States and with respect to foreign countries. *Hanover Star Milling Co. v. Metcalf (Tea Rose Case)*, 240 U.S. 403, 413 (1916) *superseded by statute*, Lanham Act, Pub. L. No. 79-489, 60 Stat. 435, *as recognized in Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 199–200 (1985), concerned the TEA ROSE mark being used with respect to flour distributed from different mills in different parts of the United States. The Supreme Court considered common law principles and explained the scope of the mark's function:

> Into whatever markets the use of a trade-mark has extended, or its meaning has become known, there will the manufacturer or trader whose trade is pirated by an infringing use, be entitled to protection and redress. But this is not to say that the proprietor of a trade-mark, good in the markets where it has been employed, can monopolize markets that his trade has never reached and where the mark signifies not his goods but those of another. We agree with the court below that "Since it is the: trade, and not the mark, that is to be protected, a

---

4      *See also ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 155 (2d Cir. 2007) ("The principle of territoriality is basic to American trademark law."); *Am. Circuit Breaker Corp. v. Or. Breakers Inc.*, 406 F.3d 577, 581 (9th Cir. 2005) ("It is now generally agreed and understood that trademark protection encompasses the notion of territoriality.").

> trade-mark acknowledges no territorial boundaries of municipalities or states or nations, but extends to every market where the trader's goods have become known and identified by his use of the mark. But the mark, of itself, cannot travel to markets where there is no article to wear the badge and no trader to offer the article."

*Id.* at 415–16 (emphasis added) (internal citations omitted). *See United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97 (1918) ("There is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed. . . . [T]he right to a particular mark grows out of its use, not its mere adoption . . . ."); *see also Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 70 (2d Cir. 2008) ("The principle of territoriality is fundamental to trademark law. A trademark has a separate legal existence under each country's laws, and trademark rights exist in each country solely according to that nation's laws." (first citing *Punchgini*, 482 F.3d at 155; and then citing *Person's*, 900 F.2d at 1568–69)). While the territoriality principle with respect to use of marks in different sections of the United States has been changed by the Lanham Act, the territoriality principle still applies with respect to use of marks in different countries.[5] With respect to international usage, a

---

[5]   *See McCarthy on Trademarks* § 29:2 ("Priority of trademark rights in the United States depends solely upon priority of use in the United States, not on priority of use anywhere in the world. Prior use in a foreign nation does not establish priority of use in America."); *see also id.* § 26:32 ("[R]egistration under the federal act of 1905, for purposes of territorial protection, did not confer any greater rights than exist at common law, under the TEA ROSE-*Rectanus* doctrine. However, the 1946 federal

12    MEENAXI ENTERPRISE, INC. v. THE COCA-COLA COMPANY

trademark right generally extends only to countries in which the mark is used.

We recognized the territoriality principle in *Person's*. Person's was a well-known retailer in Japan. *Person's*, 900 F.2d at 1567. Christman, a U.S. citizen, began producing goods bearing the Person's mark in the United States and subsequently registered the mark in the United States. *Id.* Thereafter, the Japanese owner of the PERSON'S mark in Japan began to expand its brand into the U.S. market, discovered consumer confusion with Christman's products bearing the same mark, and filed a claim for cancellation of Christman's registration, claiming priority. *Id.* The Board granted summary judgment for Christman, and this court affirmed. *Id.* at 1568.

The court noted there was "no evidence to suggest that the 'PERSON'S' mark had acquired any notoriety in this country at the time of its adoption by Christman" such that Person's "had no reputation or goodwill upon which Christman could have intended to trade." *Id.* at 1567. And the court confirmed that "when Christman initiated use of the mark," Person's "had not yet entered U.S. commerce," "had no goodwill in the United States[,] and the 'PERSON'S' mark had no reputation here." *Id.* at 1569–70. Thus, this court held that reliance by Person's on its foreign use in Japan could not support its priority claim because foreign

---

Lanham Act changed all this."); *id.* § 26:52 ("Many cases of infringements of federally unregistered marks are asserted in federal court under Lanham Act § 43(a). In such cases, territorial rights should be determined by reference to federal common law. Federal common law on territorial rights is undoubtedly the rule of the *Tea Rose-Rectanus* cases and their progeny.").

use had "no effect on U.S. commerce and cannot form the basis for a holding that [Person's] has priority here." *Id.*[6]

## II

The principle that trademark rights are geographically limited does not govern here. Coca-Cola does not claim to have U.S. trademark rights to the THUMS UP or LIMCA brands. Rather it argues that § 14(3), like § 43(a) of the Lanham Act (at issue in *Lexmark*), is not limited to the protection of trademark rights. In this respect, we agree with Coca-Cola.

In *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28–29 (2003), the Supreme Court explained, "While much of the Lanham Act addresses the registration, use, and infringement of trademarks and related marks, § 43(a), 15 U.S.C. § 1125(a) is one of the few provisions that goes beyond trademark protection." Both § 43(a) and § 14(3) extend to the improper use of marks that cause commercial injury even if the injured party is not itself a trademark holder. The Fourth Circuit clarified in *Belmora* that both § 43(a) and § 14(3) extend beyond trademark protection, as the "the plain language of § 43(a) does not require that a plaintiff possess or have used a trademark in U.S. commerce as an element of the cause of action." 819 F.3d at 706. In this respect, the court noted the similar basis and interests of § 14(3) and § 43(a) claims: "To determine if

---

[6]    In *Empresa Cubana Del Tabaco v. General Cigar Co.*, 753 F.3d 1270, 1275 (Fed. Cir. 2014), we held a foreign brand (Cubatabaco) had "a legitimate commercial interest in the COHIBA mark" but only because Cubatabaco's pending application had "been refused registration based on a likelihood of confusion with a registered mark," and that was "sufficient to show that the petitioner seeking to cancel the registered mark is the type of party Congress authorized under 15 U.S.C. § 1064."

a petitioner falls within the protected zone of interests, we note that § 14(3) pertains to the same conduct targeted by § 43(a) false association actions—using marks so as to misrepresent the source of goods." *Id.* at 714–15.

It remains unclear the extent to which the territoriality principle applies to aspects of the Lanham Act in § 14(3) and § 43(a) that are not concerned with the protection of trademark rights. While *Belmora* suggests that the Lanham Act applies to foreign commerce and, accordingly, that commercial injury to a company's sales in a foreign country qualifies as damage for purposes of § 14(3) and § 43(a), this view has been much criticized in the academic literature.[7] Apart from *Belmora*, there is limited authority that directly addresses whether claims under § 14(3) or § 43(a) may be based on lost sales or reputational injury occurring

---

[7]    *See McCarthy on Trademarks* § 29:1 (stating the "*Belmora* decision ignored the territoriality principle"); Connie D.P. Nichols, *Article 6bis of the Paris Convention for Well-Known Marks: Does it Require Use or a Likelihood of Consumer Confusion for Protection? Did* Belmora LLC v. Bayer Consumer Care AG. *Resolve This Question?*, 30 Ind. Int'l & Comp. L. Rev. 235, 248 (2020) (stating the *Belmora* decision "starkly breaks from the principles of territoriality and unfair competition cases"); Christine H. Farley, *No Trademark, No Problem*, 23 B.U. J. Sci. & Tech. L. 304, 313 (2017) (stating the *Belmora* decision "failed to acknowledge that its ruling challenged fundamental principles of trademark law"); Mark P. McKenna & Shelby Niemann, *2016 Trademark Year in Review*, 92 Notre Dame L. Rev. Online 112, 122 (2016) (stating the *Belmora* decision "is especially notable . . . [in] its failure to recognize the implications of its decision for the territoriality of trademark rights").

solely outside the United States.[8]  In any event, the extent to which the Lanham Act applies to activities outside the United States is not a question implicated here.  Coca-Cola bases its claim entirely on alleged injury occurring in the United States.

In this respect, Meenaxi contends that Coca-Cola lacks a statutory cause of action under *Lexmark* because, as a result of Meenaxi's activity, (1) there were no lost sales in the United States and (2) there was no reputational injury in the United States.

## A

As to lost sales, we agree with Meenaxi.  Coca-Cola does not identify any lost sales in the United States but instead relies on testimony from Mr. Dasani that "THUMS UP-branded and LIMCA-branded products are resold in

---

[8]    *See Punchgini*, 428 F.3d at 171 (considering argument that defendant's Bukhara Grill in New York would cause reputational injury by discouraging disappointed customers from visiting the plaintiff's Bukhara restaurants in India); *Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco*, 329 F.3d 359, 366 (4th Cir. 2003) (finding that the unregistered "Casino de Monte Carlo" service mark was "used in commerce because United States citizens purchase casino services sold [in Monaco] by a subject of a foreign nation," that those "purchases constitute trade with a foreign nation that Congress may regulate under the Commerce Clause," and that the casino's promotions in the United States use the mark in "advertising of [these] services . . . rendered in commerce"); *Havana Club Holding, S.A. v. Galleon S.A.*, 203 F.3d 116, 131–32 (2d Cir. 2000) (addressing argument that commercial injury was based on lost sales in Cuba but upholding finding that evidence did not demonstrate the likelihood of such lost sales).

Indian grocery stores around the world, including in the U.S.," and from Mr. Pittman that third-parties import "authentic Thums Up and Limca beverage products from countries outside of the U.S. for subsequent resale in the U.S." J.A. 28 (first quoting J.A. 3055 ¶ 39; and then quoting J.A. 3590 ¶ 13). As additional support, Coca-Cola provided evidence showing one instance of importation, websites of past and present sellers of the Thums Up and Limca beverages, and availability on Amazon. But these sales generated by third parties who are not authorized U.S. distributors do nothing to establish lost sales by Coca-Cola in the United States.[9]

In terms of Coca-Cola's own activity, Coca-Cola presented no evidence that it sells the Limca soda in the United States.[10] As to Thums Up, Coca-Cola established only that Thums Up cola is "available for purchase as an individual beverage or as part of a tasting tray" at "World of Coca-Cola" and "Coca-Cola Store" locations in Atlanta and Orlando. J.A. 3591 ¶ 18. Coca-Cola did not quantify the amount of Thums Up cola it distributes at World of Coca-Cola and does not claim that it is more than de minimis. Nor did Coca-Cola show that it has lost any U.S. sales as a result of Meenaxi's activities. Coca-Cola did present statements regarding future plans to market Thums Up

---

[9]    Although affidavits by Mr. Dasani and Mr. Pittman claim that these distributors or importers are "authorized," J.A. 3055 ¶ 40; J.A. 3593 ¶ 31, the evidence that Coca-Cola relies on is a distribution agreement with M/S Jay Ambe Agencies that by its own terms allows distribution "only in and throughout the 'Primary Service Area'" explicitly defined as "Vashi, Navi Mumbai," J.A. 3521, 3535.

[10]    The Board referenced Mr. Pittman's affidavit noting that imports of Coca-Cola's Thums Up and Limca beverages were blocked by U.S. Customs. But these imports were by third parties, not by Coca-Cola itself.

and Limca beverages more broadly in the United States, but nebulous future plans for U.S. sales cannot be the basis for a Lanham Act claim. *Compare Brooklyn Brewery*, 17 F.4th at 139 (finding that "hypothetical future possible injury is insufficient to establish Article III standing" where the plaintiff "did not provide any details of a concrete plan for . . . expansion of its business"); *JTEKT Corp. v. GKN Auto. Ltd.*, 898 F.3d 1217, 1221 (Fed. Cir. 2018) ("[W]here the party relies on potential infringement liability as a basis for injury in fact, but is not currently engaging in infringing activity, it must establish that it has concrete plans for future activity that creates a substantial risk of future infringement or [would] likely cause the patentee to assert a claim of infringement."). Coca-Cola did not establish damage from lost sales.

B

This leads us to the question of reputational injury. Courts disagree regarding whether famous marks are entitled to protection from reputational injury in the United States even though the marks were used solely outside of this country. *See Grupo Gigante S.A. de C.V. v. Dallo & Co.*, 391 F.3d 1088, 1094 (9th Cir. 2004) (recognizing exception to territoriality principle for famous marks); *see also Person's*, 900 F.2d at 1570 (recognizing some case law related to a famous-mark exception). *But see Punchgini*, 482 F.3d at 163–65 (rejecting exception for famous marks). But Coca-Cola does not rely on a famous-marks exception. It maintains only that it experienced reputational injury in the United States because (1) members of the Indian-American community in the United States were aware of the THUMS UP and LIMCA marks and (2) Meenaxi traded on Coca-Cola's goodwill with Indian-American consumers in those marks by misleading them into thinking that Meenaxi's beverages were the same as those sold by Coca-Cola in India. The Board agreed: "The evidentiary record . . . also shows that the reputation of [Coca-Cola's] THUMS UP and LIMCA beverages would extend to the United

States, at least among the significant population of Indian-American consumers."  J.A. 26.

Coca-Cola failed to explain how its supposed reputational injury adversely affected its commercial interests other than to speculate that a consumer dissatisfied with Meenaxi's products might blame Coca-Cola.  The Supreme Court in *Lexmark* explained that a cognizable "economic and reputational injury" generally "occurs when deception of consumers causes them to withhold trade from the plaintiff."  572 U.S. at 133.  The authorities on which *Lexmark* relied (authorities contemporaneous with the passage of the Lanham Act), *see id.* at 131, explained that the tort of passing off "imposes liability upon one who diverts custom from another to himself by fraudulent misrepresentation" and thus "divert[s] to the actor the benefit of a reputation associated with the other."  Restatement (First) of Torts ch. 35, intro. note (1938); *see also* Edward S. Rogers, *Book Review: The Law of Unfair Competition and Trade Marks*, 39 Yale L. J. 297, 299 (1929) ("The right of a business man is to have full benefit of the reputation he has established, a part of which is the trade that, without interference, would normally flow to him . . . .").  As we have discussed earlier, Coca-Cola alleges no lost U.S. sales as a result of the claimed reputational injury in the Indian-American community.

We need not decide what other types of U.S. commercial injury to reputation among U.S. consumers would be sufficient to establish a Lanham Act cause of action because substantial evidence does not support the Board's finding that the Indian-American community is aware of the THUMS UP and LIMCA marks.

The Board's findings are primarily related to Coca-Cola's activity and reputation in India,[11] but that does not establish reputation within the Indian-American community in the United States. Here, for U.S. reputational injury, Coca-Cola relies on the Board's finding that the reputation of the THUMS UP and LIMCA marks "would extend to the United States, at least among the significant population of Indian-American consumers." J.A. 26. Substantial evidence does not support that finding.

The Board's conclusion that reputation of the THUMS UP and LIMCA marks would extend to the millions of Indian Americans appears to rest in part on an assumption that Indian Americans would necessarily be aware of the marks' reputations in India. There is no basis to assume that an American of Indian descent is aware of brands in India. The Board did not consider what portion of Indian Americans had spent time in India, i.e., how many had

---

[11]    For example, the Board noted that the Indian High Court of Delhi had determined that both the THUMS UP and LIMCA marks were "well known" in India. The Board also noted that Coca-Cola "commands a substantial market share for such goods in India" and that it "sells and promotes THUMS UP and LIMCA sodas outside of India, in numerous other countries." J.A. 26. And Meenaxi admitted in response to an interrogatory that it was aware that "THUMS UP was used in India by an Indian company" in the 1970s. J.A. 2508. Meenaxi founder Kaushik Gandhi and president Meenaxi Gandhi admitted they were aware of the Thums Up and Limca beverages in India. Meenaxi's corporate witness testified that Meenaxi was aware of a customer commenting that a "mark Meenaxi used for its own Thums Up jeera masala [beverage], is a mark they had seen in use in India." J.A. 2861. But this evidence demonstrates only the reputation of the marks in India and other foreign countries.

visited India or lived in India.  The Board's conclusion relies at least in part on stereotyped speculation.

The limited U.S. sales of Coca-Cola's Indian product by third parties are not sufficient to establish that the product had a reputation in the United States, nor did the Board find that they did.  Coca-Cola has not presented any survey evidence showing awareness of either mark in the United States.  Instead, to show U.S. reputation, Coca-Cola submitted affidavits by Mr. Dasani and Mr. Pittman stating their "understanding" that the THUMS UP and LIMCA branded beverages were "extremely popular and well-received by consumers in the U.S."  J.A. 3055 ¶ 39; J.A. 3592 ¶ 21.  But these statements of understanding are made without support.  This would be insufficient under the Federal Rules of Evidence, Rule 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."), and the Federal Rules of Evidence generally apply to Board proceedings, 37 C.F.R. § 42.62(a).  The failure to provide any basis for their statements of understanding deprives this testimony of evidentiary weight.[12]

---

[12]    For summary judgment, the Federal Rules of Civil Procedure state, "An affidavit or declaration used to support or oppose a motion <u>must be made on personal knowledge, set out facts that would be admissible in evidence</u>, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4) (emphasis added).  In this context also, statements of belief and understanding have been found insufficient. *See Pace v. Capobianco*, 283 F.3d 1275, 1278–79 (11th Cir. 2002) ("[A]n affidavit stating only that the affiant 'believes' a certain fact exists is insufficient to . . . creat[e] a genuine issue of fact about the existence of that certain fact."); *Doff v. Brunswick Corp.*, 372 F.2d 801, 804 n.1 (9th Cir. 1966)

At oral argument, counsel for Coca-Cola admitted that Meenaxi's admission of a single instance of U.S. consumer awareness was the only evidence in the record showing U.S. consumer awareness of Coca-Cola's THUMS UP mark. That evidence consists of an admission by Meenaxi's corporate witness that Meenaxi had received a U.S. customer comment recognizing the THUMS UP mark, but not the LIMCA mark, as one he or she had seen in India.[13] This is plainly insufficient. In a related context in *Person's*, the awareness of a U.S. citizen as a result of travel to Japan was not sufficient to establish awareness by U.S. consumers generally. 900 F.2d at 1567, 1569–70.

Finally, the Board relied on the evidence that Meenaxi copied Coca-Cola's marks and slogan for products in the

---

(rejecting affidavit that stated affiant's "understanding" because it did "not contain 'specific facts' based on 'personal knowledge'" (quoting Fed. R. Civ. P. 56(e)).

[13]   The testimony is as follows:

Q.  Okay. Miss Sundarraj, has Meenaxi Enterprise ever had any customer comment that the mark -- that any mark Meenaxi used for its own Thums Up jeera masala lemon masala, is a mark they had seen in use in India?

MR. RANNELLS: Objection as to form.

A.  Yes.

Q.  Are you aware of any customer ever commenting to Meenaxi Enterprise that the mark, any mark Meenaxi used for its Limca lemon masala soda, looked similar to the mark that the customer had seen in India?

A.  No.

J.A. 2861.

U.S. as evidence of awareness of the marks by U.S. consumers.  On appeal, Coca-Cola does not rely on this finding to establish a U.S. reputation.  Nor could it.  The copying of a U.S. mark has been held to support a finding of secondary meaning, *Converse, Inc. v. ITC*, 909 F.3d 1110, 1120 (Fed. Cir. 2018), or likelihood of confusion, *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 618 F.2d 950, 954 (2d Cir. 1980), in the United States.  But Coca-Cola has cited no cases holding that copying of a foreign mark is evidence of U.S. reputation, and our decision in *Person's* held the contrary.  900 F.2d at 1569–70.

We hold that substantial evidence does not support the Board's finding that the reputations of Coca-Cola's THUMS UP and LIMCA marks extend to the United States.  Without such evidence, Coca-Cola has not established reputational injury in the United States, or a cause of action under § 14(3) of the Lanham Act.

## CONCLUSION

The Board's decision cancelling the '597 Registration and the '598 Registration cannot stand because Coca-Cola has not established that it has a cause of action under § 14(3) of the Lanham Act.

## **REVERSED**

### COSTS

Costs to Meenaxi.

# United States Court of Appeals
# for the Federal Circuit

---

**MEENAXI ENTERPRISE, INC.,**
*Appellant*

**v.**

**COCA-COLA COMPANY,**
*Appellee*

---

2021-2209

---

Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board in Nos. 92063353, 92064398.

---

REYNA, *Circuit Judge*, concurring.

I concur with the majority's decision to reverse the Trademark Trial and Appeal Board's cancellation of U.S. Trademark Registration Nos. 4,205,597 and 4,205,598. I agree that Coca-Cola failed to establish statutory standing to bring its petition for cancellation under § 14(3) of the Lanham Act. I also agree with my colleagues that the Board's findings regarding the recognition of Coca-Cola's Indian trademarks among U.S. consumers are unsupported by substantial evidence, though I believe that issue was waived by Coca-Cola.

I write separately to express my belief that this case is governed by the territoriality principle. The majority bases its decision exclusively on two factual inquiries—

2    MEENAXI ENTERPRISE, INC. v. THE COCA-COLA COMPANY

(1) whether Coca-Cola proved lost sales *in the United States*, and (2) whether Coca-Cola proved reputational injury *among U.S. consumers*. In my view, these inquiries are directly reflective of the territoriality principle and the well-known mark exception.

I

I agree that Coca-Cola failed to establish use of its Indian trademarks in the United States. *See* Maj. Op. 16 (holding that Coca-Cola failed to establish statutory standing because it "presented no evidence that it sells the Limca soda in the United States" and "did not quantify the amount of Thums Up cola it distributes [in the United States] and does not claim that it is more than de minimis"). I therefore conclude that, under the territoriality principle, Coca-Cola failed to show the requisite damage to establish statutory standing to bring its petition.

"The concept of territoriality is basic to trademark law; trademark rights exist in each country solely according to that country's statutory scheme." *Person's Co., Ltd. v. Christman*, 900 F.2d 1565, 1568–69 (Fed. Cir. 1990) (citing *Fuji Photo Film Co., Inc. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 599 (5th Cir. 1985); *Ingenohl v. Walter E. Olsen & Co.*, 273 U.S. 541, 544 (1927)); *see also In re Bayer Aktiengesellschaft*, 488 F.3d 960, 969 (Fed. Cir. 2007) ("Evidence of registration in other countries is not legally or factually relevant to potential customer perception of Bayer's analgesic goods in the United States."). This means that "priority of trademark rights in the United States depends solely upon priority of use in the United States, not on priority of use anywhere in the world" because "[e]arlier use in another country usually just does not count." *Grupo Gigante SA De CV v. Dallo & Co., Inc.*, 391 F.3d 1088, 1093 (9th Cir. 2004) (citations omitted).

The territoriality principle reflects the limits of Congress's constitutional lawmaking authority to enact the Lanham Act—here, the Commerce Clause. *See Person's*,

900 F.2d at 1568 ("No specific Constitutional language gives Congress power to regulate trademarks, so the power of the federal government to provide for trademark registration comes only under its commerce power."). In *Person's*, we recognized that foreign use of a Japanese trademark "has no effect on U.S. commerce and cannot form the basis for a holding that [the foreign producer] has priority here" in the United States. *Id.* Thus, we concluded in *Person's* that the owner of a foreign trademark had no claim for priority against a copycat junior user if the foreign producer was not the first to use the mark in the United States. *Id.* at 1571–72. This principle extends to all cancellation provisions in the Lanham Act, which necessarily implicate Congress' authority to govern the registration of U.S. trademarks.

Under § 14 of the Lanham Act, "any person who believes that he is or will be *damaged* . . . by the registration of a mark" may file a petition for cancellation subject to the filing deadlines of § 14(1)–(6). 15 U.S.C. § 1064 (emphasis added). Relevant here, § 14(3) provides that a petition may be filed "[a]t any time if . . . the registered mark is being used by . . . the registrant so as to misrepresent the source of the goods or services on or in connection with which the mark is used." 15 U.S.C. § 1064(3). The injury requirement for establishing statutory standing to bring a cancellation under § 14(3)—belief that one is or will be damaged—is not subject to a different territoriality principle than the rest of § 14. Rather, our precedent and fundamental principles of constitutional law compel the conclusion that damage to a foreign trademark right (i.e., damage to the commercial goodwill associated with foreign use of a mark) cannot constitute "damage[]" for purposes of 15 U.S.C. § 1064, even though it may be a cognizable injury-in-fact and even if the petition is brought under subsection (3). *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 131–32 (2014) (explaining that not every cognizable injury-in-fact results in statutory

4     MEENAXI ENTERPRISE, INC. v. THE COCA-COLA COMPANY

standing under the Lanham Act).  As a default rule, the Lanham Act does not reach so far as to vindicate that extraterritorial injury.

On that basis, I concur with the majority's conclusion that Coca-Cola failed to establish statutory standing to bring its petition for cancellation.  As the majority acknowledges, Coca-Cola failed to establish any damage to goodwill associated with its use of the marks in U.S. commerce.  And to the extent Coca-Cola relies on damage to its foreign trademark rights to establish statutory standing, the territoriality principle mandates that such an injury does not fall within the "zone of interests" that Congress intended to protect by enacting § 14 of the Lanham Act.

II

I also agree with the majority's conclusion that Coca-Cola failed to show statutory standing because it failed to prove damage to its reputation among U.S. consumers.  I note, however, that this issue goes to the application of the "well-known mark" exception to the territoriality rule—an issue that, as I noted above, was waived by Coca-Cola.

There is a distinction in the case law regarding how the territoriality principle limits the reach of the Lanham Act, depending on where the parties are situated.  For instance, when a domestic party seeks to assert rights against activity occurring abroad, courts may apply the Lanham Act extraterritorially if the accused activity substantially affects U.S. commerce.  *See, e.g.*, *Steele v. Bulova Watch Co.*, 334 U.S. 280 (1952); *Wells Fargo & Co. v. Wells Fargo Exp. Co.*, 556 F.2d 406 (9th Cir. 1977); *Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733 (2d Cir. 1994); *McBee v. Delica Co., Ltd.*, 417 F.3d 107 (1st Cir. 2005).  But when a foreign party seeks to assert foreign rights against activity in the United States, as is the case here, the territoriality

principle precludes recovery via the Lanham Act for reasons already discussed.[1]  *See Person's*, 900 F.2d at 1568–69.

Because the presumption against extraterritoriality can sometimes lead to seemingly harsh or unfair results, the Ninth Circuit adopted an exception to the rule for foreign marks that are well-known among U.S. consumers. *See Grupo Gigante*, 391 F.3d at 1094.  The majority correctly notes that not every court accepts the well-known mark exception to the presumption against extraterritoriality. *See ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 163–65 (2d Cir. 2007).  It remains an open question whether such an exception could apply in this circuit, but the present facts are not unlike the facts from *Grupo Gigante*.

In *Grupo Gigante*, a U.S. producer sold copycat products near the U.S.-Mexico border using a well-known Mexican brand.  391 F.3d at 1091–92.  Because Mexican nationals living on the U.S. side of the border were likely to think the knock-off products were genuine products from Mexico, the Ninth Circuit permitted the Mexican producer to assert its Mexican trademark rights against a domestic user who would have otherwise enjoyed priority in the United States under the territoriality principle.  *Id.* at 1094.  The Ninth Circuit explained:

> [T]here is a famous mark exception to the territoriality principle.  While the territoriality principle is a long-standing and important doctrine within

---

[1]    Indeed, even the majority implicitly acknowledges that the issue of territoriality permeates its second question of reputational injury.  *See* Maj. Op. 18 ("As we have discussed earlier, Coca-Cola alleges *no lost U.S. sales* as a result of the claimed reputational injury in the Indian-American community." (emphasis added)).

> trademark law, it cannot be absolute. An absolute territoriality rule without a famous-mark exception would promote consumer confusion and fraud. Commerce crosses borders. In this nation of immigrants, so do people. Trademark is, at its core, about protecting against consumer confusion and 'palming off.' There can be no justification for using trademark law to fool immigrants into thinking that they are buying from the store they liked back home.

*Id.*

Here, I agree with the majority that the Board's findings regarding recognition among U.S. consumers are unsupported by substantial evidence, but I believe the issue is immaterial because Coca-Cola unambiguously disclaimed reliance on the well-known mark exception, which is essentially the same inquiry. I also note that the majority's opinion could be reasonably read to imply that Coca-Cola could have established statutory standing if it proved that U.S. consumers were aware of its Indian brands. But if that were the case, I would still reverse because the territoriality doctrine governs, and Coca-Cola waived reliance on the well-known mark exception thereto.