This Opinion is a
Precedent of the TTAB

Hearing: November 13, 2024                    Mailed: January 17, 2025

UNITED STATES PATENT AND TRADEMARK OFFICE

‾‾‾‾

Trademark Trial and Appeal Board

‾‾‾‾

*Plumrose Holding Ltd.*
*v.*
*USA Ham LLC*

‾‾‾‾

Opposition No. 91272970

‾‾‾‾

Douglas A. Rettew, Lisa Peller London, of Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P.,
    for Plumrose Holding Ltd.

Felipe Rubio, of Rubio & Associates,
    for USA Ham LLC.

‾‾‾‾

Before Kuhlke, Cohen, and Casagrande, Administrative Trademark Judges.

Opinion by Casagrande, Administrative Trademark Judge:

USA Ham LLC ("Applicant") applied to register the mark below on the Principal Register for "Ham; Meat; Pork; Cold cuts; Cold cuts, namely, mortadella, pork loin, ham, bologna, salami, chorizo; Pork tenderloin; Processed meat; Sausage meat; Smoked sausages; Snack food dips" in International Class 29:

[1]

Plumrose Holding Ltd. ("Opposer") filed a Notice of Opposition to registration of Applicant's mark.[2] The Notice of Opposition alleges that Opposer is the sole owner of a company called La Montserratina, C.A. ("Opposer's Venezuelan company"), that sells a wide range of pre-packaged meat products in Venezuela.[3] The Notice further alleges that, in connection with such sales, Opposer's Venezuelan company has used the mark LA MONTSERRATINA since 1949 and, since 2011, the following composite mark:

.[4]

---

[1]    Application Serial No. 90374795 was filed on December 11, 2020, based upon Applicant's allegation of a bona fide intention to use the mark in commerce under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b). On June 11, 2021, Applicant, pursuant to Section 1(c), 15 U.S.C. § 1051(c), filed an amendment to allege a date of first use anywhere and in commerce of December 1, 2020, along with photographs of one package of sausages bearing the applied-for mark as a specimen.

[2]    *See* 1 TTABVUE. References to the briefs, other filings in the case, and the record cite the Board's TTABVUE docket system. The number preceding "TTABVUE" is the docket number assigned to the cited filing in TTABVUE and any number immediately following "TTABVUE" identifies the specific page(s) to which we refer.

[3]    *See id.* at 3.

[4]    *See id.*

The Notice of Opposition also alleges that, through Opposer's use of its LA MONTSERRATINA marks in Venezuela, the marks are well-known, famous, and have a reputation for superior quality in Venezuela and among Venezuelans living in the United States.[5] The Notice alleges that Opposer plans to enter the U.S. market and, in 2021, filed applications with the USPTO to register its two marks.[6]

Opposer alleges that the parties' marks consist of identical words, and in the case of Applicant's composite mark, use identical typefaces.[7] It further alleges that the specimens of use submitted by Applicant in connection with its application show a sausage product bearing a label that "blatantly copies" Opposer's labels.[8]

The Notice asserted three claims, but at trial Opposer advanced only one of them: that, in violation of Section 14(3) of the Lanham Trademark Act, 15 U.S.C. § 1064(3), Applicant is using its mark to misrepresent source. Opposer specifically alleges that Applicant is trying to benefit from the goodwill and reputation of Opposer's marks among U.S. consumers, and that Applicant's actions are damaging Opposer.[9]

---

[5]  *See id.* at 4-5. The Notice also alleges that Opposer applied in 2015 to register its LA MONTSERRATINA marks with the USPTO, but ultimately abandoned the applications because economic disruption caused by political turmoil in Venezuela interrupted its plan to enter the U.S. market at that time. *See id.* at 5.

[6]  *See id.* at 5-6.

[7]  *See id.* at 6.

[8]  *See id.* at 7.

[9]  *See id.* at 7-8. The other two pleaded claims were for "non-ownership" and "fraud," *see id.* at 8-9, but Opposer forfeited them by failing to pursue them in its trial brief. *See, e.g.*, *WeaponX Performance Prods. Ltd. v. Weapon X Motorsports, Inc.*, No. 91221553, 2018 WL 1326374, at *2 (TTAB 2018) ("Opposer did not pursue this claim at trial or argue it in its trial brief, and it is accordingly waived.") (citations omitted). Please note that, as to legal citation form, this opinion is issued as part of an internal Board pilot citation program on broadening acceptable forms of legal citation in Board cases. Westlaw (WL) citations are used for precedential decisions of the Board. Decisions of the U.S. Court of Appeals for the Federal

Applicant's Answer denied the salient allegations in the complaint, admitting only that it filed the challenged application.[10] Applicant's Answer also asserted the "affirmative defense" that, having filed two applications despite allegedly lacking bona fide intent to use its LA MONTSERRATINA marks in the U.S., Opposer acted in "bad faith" and has "unclean hands."[11] But Applicant's brief does not mention unclean hands or bad faith, and it mentions Opposer's pending applications only in connection with its argument that Opposer cannot show statutory entitlement under *Meenaxi Enterprise, Inc. v. Coca-Cola Co.*, 38 F.4th 1067 (Fed. Cir. 2022), an issue we address below.[12]

The parties filed main briefs[13] and Opposer filed a reply brief.[14] On November 13, 2024, we held an oral hearing at which both parties' counsel appeared.[15]

For the reasons explained below, we sustain the opposition.

---

Circuit and the U.S. Court of Customs and Patent Appeals are cited only to the Federal Reporter (e.g., F.2d, F.3d, or F.4th). This opinion thus adheres to the practice set forth in the TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE ("TBMP") § 101.03 (2024).

[10] *See* 4 TTABVUE.

[11] *See id.* at 6.

[12] *See* 47 TTABVUE 22, 31. Under the heading "Affirmative Defenses," Applicant included an allegation that the Notice of Opposition fails to state a claim upon which relief can be granted. *See* 4 TTABVUE 6. This is not an affirmative defense. *See, e.g.*, *Shenzhen IVPS Tech. Co. v. Fancy Pants Prods., LLC*, No. 91263919, 2022 WL 16646840, at *1 n.5 (TTAB 2022). Applicant also asserted that it "reserves the right" to amend its defenses. *See* 4 TTABVUE 6. This, too, is improper. *See Made in Nature, LLC v. Pharmavite LLC*, No. 91223352, 2022 WL 2188890, at *3 (TTAB 2022)) (Applicant's "attempt to reserve the right to add defenses is improper under the Federal Rules of Civil Procedure, because that would not give ... Opposer fair notice of such defenses.") (cleaned up; citations omitted).

[13] *See* 46 TTABVUE (Opposer's trial brief); 47 TTABVUE (Applicant's trial brief).

[14] *See* 48 TTABVUE.

[15] *See* 55 TTABVUE.

## I. The Record

The record includes the pleadings and, by operation of Trademark Rule 2.122(b),

37 C.F.R. § 2.122(b), the file of the challenged application.

During its trial period, Opposer filed:

- The trial declaration of Frederik Madsen, one of its Directors and CEO of Opposer's Venezuelan company,[16] with exhibits including:

  - Opposer's product catalog;[17]

  - A copy of the TSDR Status and Title of Opposer's two pending applications, as well as the Suspension Notices entered in each based on potential confusion with Applicant's involved mark;[18]

  - Screenshots of several customer inquiries (with translations of those that are in Spanish) on Opposer's social media accounts;[19]

  - A print-out of Opposer's PowerPoint presentation about Venezuelan populations in the U.S. and other countries in connection with Opposer's possible expansion plans;[20]

  - A print-out of Opposer's PowerPoint presentation about its Facebook and Instagram social media accounts, by country;[21] and

---

[16] *See* 26 TTABVUE 2-28.

[17] *See id.* at 31-53. The catalog is in Spanish and there's no translation of the text. Generally, "[m]aterial in foreign languages which has not been translated into English has limited probative value." *Int'l Dairy Foods Ass'n v. Interprofession du Gruyère*, No. 91232427, 2020 WL 4559436, at *8 (TTAB 2020), *aff'd*, 575 F. Supp. 3d 627 (E.D. Va. 2021), *aff'd*, 61 F.4th 407 (4th Cir. 2023). However, we are not relying on the catalog for anything other than how Opposer's mark is depicted and how its labels look. A translation is not essential for those limited purposes.

[18] *See* 26 TTABVUE at 55-62 (Ser. No. 90544915 for ) ("Opposer's '915 Application"); *id.* at 63-70 (Ser. No. 90544932 for LA MONTSERRATINA) ("Opposer's '932 Application").

[19] *See id.* at 72-130.

[20] *See id.* at 132-42.

[21] *See id.* at 167-74.

- o A copy of the TSDR Status and Title of Opposer's abandoned 2015 applications.[22]

- The June 29, 2023, testimony declaration, with exhibits, of Alicia Rodriguez, an Administrator for Meat Town Distributors, attesting to her purchase of Applicant's products bearing the mark in the challenged application;[23]

- A first Notice of Reliance attaching selected answers by Applicant to Opposer's interrogatories, along with exhibits referenced in the answers;[24]

- A second Notice of Reliance attaching selected responses by Applicant to Opposer's requests for admission;[25] and

- A third Notice of Reliance attaching excerpts from the discovery deposition of Applicant under Fed. R. Civ. P. 30(b)(6), along with several deposition exhibits discussed in the excerpts.[26]

During its trial period, Applicant submitted:

- A Notice of Reliance attaching documents including:

  - o A copy of Opposer's answers to Applicant's interrogatories;[27] and

  - o A copy of Opposer's responses to Applicant's requests for admission;[28]

- The testimony declaration of Applicant's General manager, Elio Pereira (in Spanish), with an English translation certified by Applicant's counsel;[29] and

---

[22] *See id.* at 176-81.

[23] *See* 27 TTABVUE.

[24] *See* 28 TTABVUE.

[25] *See* 29 TTABVUE. Only admissions may be submitted under Notice of Reliance. *See* Trademark Rule 2.120(k)(3)(i), 37 C.F.R. § 2.120(k)(3)(i).

[26] *See* 30 TTABVUE.

[27] *See* 32 TTABVUE 12-39.

[28] *See id.* at 41-46. As noted *supra*, only admissions may be submitted under Notice of Reliance.

[29] *See* 35 TTABVUE.

- The September 8, 2023, testimony declaration (in Spanish), with one exhibit, of Alicia Rodriguez, with an English translation certified by Applicant's counsel.[30]

## II. Opposer is Entitled to File This Statutory Opposition Proceeding

In every inter partes case, the plaintiff must establish that it is entitled to invoke the statute authorizing the proceeding it filed. Here, that statute is Section 13 of the Trademark Act, 15 U.S.C. § 1063, which provides for the filing of an opposition by "[a]ny person who believes that he would be damaged by the registration of a mark upon the principal register … ." An opposition plaintiff must demonstrate: (i) an interest falling within the zone of interests protected by the opposition statute; and (ii) proximate causation. *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 1303 (Fed. Cir. 2020) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 120-37 (2014)); *id.* at 1305 (applying *Lexmark* to inter partes TTAB cases). "The purpose of the zone-of-interests test is to foreclose suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *Corcamore*, 978 F.3d at 1305 (quoting *Lexmark*, 572 U.S. at 130) (cleaned up).

Demonstrating a real interest in opposing registration of a mark satisfies the zone-of-interests requirement, and demonstrating a reasonable belief in damage by the registration of a mark establishes damage proximately caused by registration of

---

[30] *See* 36 TTABVUE. Applicant also submitted two additional notices of reliance, *see* 33 TTABVUE; 34 TTABVUE, but they were stricken from the record when Applicant failed to respond to Opposer's motion to strike them. *See* 39 TTABVUE.

the mark. *Id*. at 1305-06. A plaintiff "must allege an injury to a commercial interest in reputation or sales." *Lexmark*, 572 U.S. at 131-32; *Curtin v. United Trademark Holdings, Inc.*, No. 91241083, 2023 WL 3271038, at *4 (TTAB 2023) (quoting *Lexmark*).

The parties' briefs address at length whether Opposer has established statutory entitlement to oppose Applicant's application based on the alleged extension of the reputation of Opposer's LA MONTSERRATINA brand to consumers in the U.S. The trial record and briefs also reveal other facts that support the requirement of statutory entitlement to oppose. We address each in turn.

### A. Statutory entitlement to oppose based on reputational damage

The parties' arguments about whether Opposer is statutorily entitled to oppose based, not on use in the U.S., but on damage to its reputation in the U.S. based on its foreign activities, implicate the Federal Circuit's 2022 decision in *Meenaxi Enterprise*, 38 F.4th 1067. *Meenaxi*, like this case, was an *inter partes* Section 14(3) case, and it contains a lengthy discussion of several aspects of statutory entitlement that are relevant here.

#### 1. The *Meenaxi* decision

In *Meenaxi*, the plaintiff had used its two pleaded marks in India but had neither used the marks in the U.S. nor applied to register them with the USPTO. The *Meenaxi* Court faced the issue whether, in those circumstances, the plaintiff had established the requisite belief in damage required by statute. *See id*. at 1071-72, 1076-79.

*Meenaxi* first noted that U.S. trademark rights are not necessary to assert a claim under Section 14(3). *Id.* at 1074-75. The Court noted, however, that a plaintiff may demonstrate entitlement to cancel or oppose by establishing either lost sales in the U.S. or reputational injury in the U.S. *Id.* at 1075. Here, as in *Meenaxi*, there is no allegation or evidence of lost sales. The question thus became in *Meenaxi*—and becomes here—whether the foreign plaintiff can show reputational injury in the U.S.

The plaintiff in *Meenaxi* argued that its reputation extended to a significant portion of Indian-American consumers. But the Court found the supporting evidence lacking. *Id.* at 1077-78. In particular, the Court cited the lack of evidence regarding how many Indian-Americans had visited or lived in India. *Id.* at 1078. The Court also pointed out that a few limited re-sales by third parties of the plaintiff's Indian products in the U.S. was insufficient to establish the reputation of the plaintiff's brand in the U.S., and that the testimony of two of the plaintiff's managers that they "understood" that their Indian products were well received in the U.S. lacked any basis. *Id.* Although there was evidence that one customer commented about having seen one of the plaintiff's two marks in India, the Court noted that the plaintiff did not contend that was sufficient to establish the plaintiff's reputation in the U.S. and held that, in any event, one such instance relating to only one of the marks in that case would be insufficient to establish that the plaintiff's reputational interest in the two marks extended into the U.S. *Id.* at 1079. The Court left for another day what "types of U.S. commercial injury to reputation among U.S. consumers," other than lost sales, "would be sufficient to establish a Lanham Act cause of action." *Id.* at 1077

("Coca-Cola alleges no lost U.S. sales as a result of the claimed reputational injury in the Indian-American community.").

Finally, the *Meenaxi* Court held that the defendant's copying of the plaintiff's marks and associated slogans was insufficient to establish "U.S. reputation." *Id.* at 1079. The *Meenaxi* Court cited *Person's Co. v. Christman*, 900 F.2d 1565, 1569-70 (Fed. Cir. 1990). *Person's* had held that, while the defendant there knew that the PERSON'S mark was used in Japan and copied it, "mere knowledge of prior use" did not amount to culpable, bad-faith behavior. 900 F.2d at 1570.

### 2. Evidence of Opposer's reputation in the U.S. from Consumers

This case is materially different from *Meenaxi* (and *Person's*) in several ways that are legally significant. Here, Opposer has provided evidence not only of multiple U.S. consumers communicating with it through social media and text messages asking whether Opposer's products are available in the U.S.,[31] but also that at least some U.S. consumers have been confused or mistaken as to whether LA MONTSERRATINA products they have seen in Florida, where Applicant sells the product, are Opposer's products.[32] And not just consumers: one of the grocery stores to whom Applicant sells testified:

> I have been familiar with the name La Montserratina for nearly 40 years as the brand name of sausage products in Venezuela. When USA Ham offered to sell my company meat products under the brand La Montserratina, I immediately

---

[31] *See* 26 TTABVUE 93, 95, 96, 97, 98, 99, 100, 101-02, 103, 105, 106, 109, 111, 114, 117, 118, 120, 121, 122, 123, 126, 127, 129.

[32] *See id.* at 104, 113, 119, 124, 125.

> recognized the brand as the one I was familiar with and placed an order.[33]

Applicant's General Manager, Mr. Pereira, also testified that another one of the stores to whom Applicant sold the product publicized the product on a social media post that linked Applicant's product with Opposer.[34] Mr. Pereira took no steps to determine whether other stores who purchased the product similarly mistook that there was a connection between Applicant's LA MONTSERRATINA products and Opposer, nor did he testify about any steps Applicant took to ensure such mistakes would not happen again.[35]

There are also messages from consumers who saw Applicant's products and, while they were not necessarily confused as to source, nevertheless informed Opposer, which indicates that they are aware of Opposer's products.[36] There is even an unsolicited communication inquiring about serving as the distributor of Opposer's products in the U.S.[37] These communications are evidence that Opposer's reputation for products under its LA MONTSERRATINA products extends to the U.S.

---

[33]   *See* 27 TTABVUE 3 (testimony declaration of Alicia Rodriguez).

[34]   *See* 30 TTABVUE 71-72. Although Mr. Pereira explained that the store quickly realized its "mistake," the pertinent fact is that the mistake was initially made, regardless of whether the store later came to understand that it had made the mistake.

[35]   *See id.* at 77-78. Mr. Pereira testified that this incident took place approximately three years before the March 2023 deposition. *See id.* at 73. That would place this incident in 2020, i.e., when Applicant first started selling products bearing the challenged mark. But as we explain and find, *infra*, a step that Applicant **did** take after that incident was to change the typeface in which it portrayed LA MONTSERRATINA on its product packaging from a typeface that was similar to Opposer's to one that is **identical** to Opposer's.

[36]   *See* 26 TTABVUE 94, 107, 110.

[37]   *See id.* at 108.

There are over twenty (20) people who asked Opposer about obtaining its products here. They would not have asked if they weren't aware of Opposer's reputation.

Five more people were confused about the source of products bearing the mark LA MONTSERRATINA. Instances of actual confusion as to source are especially significant in trademark law. As Professor McCarthy's treatise points out:

> If buyers are confused between two sources, then this also means that they must have recognized plaintiff's designation as a trademark and associated it only with plaintiff. If this is not so, how could there be any confusion over source or affiliation?

> If there is reliable evidence of actual customer confusion, then it follows logically that there must also be some secondary meaning in the senior user's designation. If people were not aware of the trademark significance of the senior mark, how could they be confused as to source or affiliation? Thus, evidence of actual confusion is also evidence of secondary meaning and trademark significance.

2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 15:11 (5th ed.) (Sept. 2024 update) ("MCCARTHY"); *see also ERBE Elektromedizin GmbH v. Canady Tech. LLC*, 629 F.3d 1278, 1290 (Fed. Cir. 2010) (listing actual confusion as a type of evidence that is relevant to demonstrating acquired distinctiveness) (applying 3d Cir. precedents).

While the issue here isn't acquired distinctiveness, the general point still obtains: these confused individuals recognized Opposer's trademark and, by that, its reputation, because that is an essential part of what a trademark symbolizes. *See, e.g.*, *Vidal v. Elster*, 602 U.S. 286, 305 (2024) ("a trademark protects the markholder's reputation") (citation omitted); *Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140, 146 (2023) (trademarks "ensure that the producer itself—and not some

'imitating competitor'—will reap the financial rewards associated with the product's good reputation") (citation omitted).

We also think that the circumstances here amplify the significance of the instances of actual confusion. In assessing the significance of the lack of actual confusion evidence in the context of a claim under Section 2(d) likelihood-of-confusion claim (the 8th confusion factor under *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 1361 (CCPA 1973)), we look at relevant market circumstances, such as how long the junior user has been selling, where it has been selling, and how much it sold. *See, e.g.*, *In re Guild Mortg. Co.*, Ser. No. 86709944, 2020 WL 1639916, at *8 (TTAB 2020). In this case, we think that those market considerations also bear on the significance of evidence of the instances of actual confusion that **have** occurred (which, in Section 2(d) cases, is the 7th confusion factor under *du Pont*, 476 F.2d at 1361). Here, there are five documented instances (six if Applicant's "mistaken" client is counted) of actual confusion. If Applicant's sales were large and widespread, that might not be so significant. Here, however, Applicant has been in the market for only about four years[38] and sells only to a handful of stores,[39] the sales totaling only about $20,000 per year[40] and amounting to only about 1% of Applicant's meat sales.[41] In light of Applicant's relatively unimpressive sales under LA MONTSERRATINA, the

---

[38]  *See, e.g.*, 35 TTABVUE 9.

[39]  *See* 30 TTABVUE 25-27, 50-53, 57-59, 61-67, 139-53.

[40]  *See id.* at 88-89.

[41]  *See id.* at 56-57.

fact that there are already five documented instances of actual confusion takes on greater significance than otherwise.

Thus, the multiple consumer inquiries about the availability of Opposer's products in the U.S., and especially the instances of actual confusion, set this case apart from *Meenaxi* and show quite clearly that Opposer's reputation for products under its mark extends to the U.S.

> 3. Evidence of Applicant's copying, unlike the copying in *Meenaxi*, is linked to Opposer's reputation in the U.S.

The *Meenaxi* Court held that the allegations of copying there did not support the plaintiff's claim that it suffered reputational damage. *See* 38 F.4th at 1079 (citing *Person's*, 900 F.2d at 1569-70). In so doing, the Court noted that, while copying is evidence of secondary meaning and also of likelihood of confusion, copying of a foreign mark "is not evidence of awareness of the marks by U.S. consumers." *Id.*[42] In other words, if U.S. consumers aren't aware of the copied mark, how can the mere act of copying the foreign mark create or confirm awareness that does not exist?

Here, however, as we have found, there **is** evidence that U.S. consumers are aware of Opposer's mark. There are multiple consumer communications inquiring where they can obtain Opposer's products. There are customers confused about whether Opposer is the source of Applicant's product. There is testimony about two of

---

[42] The Court's reference to secondary meaning and likelihood of confusion is meant, we think, to distinguish cases where both parties' marks are used in the U.S. In such cases, the threshold question whether purely-foreign usage has resulted in customer awareness in the U.S is not implicated. Rather, U.S. consumer exposure in such cases is implicit, and the only issue is to determine the trademark implications of that awareness (i.e., how do consumers perceive the mark).

Applicant's client stores making the connection to Opposer's LA MONTSERRATINA brand in Venezuela. There is evidence that Applicant moved even closer to Opposer's mark, adopting the identical typeface, after learning that one of its stores already had made a "mistake" about the source of the products. All this distinguishes this case from the situations in *Meenaxi* and *Person's*. Moreover, it provides a very different background against which to evaluate Applicant's copying. In that different light, Applicant's actions take on a culpable hue. In another context, the Federal Circuit held that "one should look at the evidence as a whole, as if each piece of evidence were part of a puzzle which, when fitted together, establishes prior use," highlighting that there were "clear interrelationships existing between the several pieces of evidence submitted." *See W. Fla. Seafood, Inc. v. Jet Rests., Inc.*, 31 F.3d 1122, 1125-26 (Fed. Cir. 1994); *see also Adamson Sys. Eng'g, Inc. v. Peavey Elecs. Corp.*, No. 92076586, 2023 WL 7274674, at *16 (TTAB 2023) (applying *W. Fla. Seafood* to the issue of abandonment). We think the guidance about being cognizant of the potential interrelationships between pieces of evidence is apt here as well. In this case, the pieces of the puzzle reveal that Opposer's brand reputation extends into the U.S., and that Applicant's copying capitalizes on that reputation.

Before detailing the nature of Applicant's copying, we begin with Applicant's knowledge of Opposer's LA MONTSERRATINA mark. Applicant's General Manager, Mr. Pereira, testified that Applicant chose LA MONTSERRATINA as the result of discussions among himself, his business partner, the wife of his business partner (who had lived in Venezuela and was familiar with Opposer's brand), and Mr.

Pereira's wife.[43] He testified that he was born in Caracas, Venezuela, and lived there for over four decades before coming to the U.S.[44] He further testified that he'd seen Opposer's marks on sausages in Caracas supermarkets,[45] elaborating that "[i]n Venezuela, [Opposer's LA MONTSERRATINA mark] has been around for many years. Since I was young."[46] Mr. Pereira believes that his business partner and his business partner's wife also were familiar with Opposer's mark as well from their time living in Venezuela.[47]

We also find it significant that Applicant has targeted stores that have Venezuelan-American customers and/or stock other Venezuelan products. In the Rule 30(b)(6) deposition of Applicant, Mr. Pereira testified that he is aware of a "large Venezuelan community" in El Doral, Florida, and that Applicant sells its products, including those bearing the LA MONTSERRATINA mark, in stores in El Doral.[48] He

---

[43]   *See* 30 TTABVUE 35-37. At other points, he testified that his business partner was also involved. *See id.* at 31, 45-46.

[44]   *See* 30 TTABVUE 19-20.

[45]   *See id.* at 38.

[46]   *See id.* at 42-43.

[47]   *See id.* at 35-36, 40, 49. Opposer's Director, Mr. Madsen, testified, without contradiction, that Opposer began selling meat products under LA MONTSERRATINA in 1949, *see* 26 TTABVUE 3, and that Opposer's "net sales of meat products under the LA MONTSERRATINA brand in Venezuela from 2012-2021 total approximately U.S. $340 million … and 62 million pounds …." *See* 26 TTABVUE 10. Opposer advertises the LA MONTSERRATINA brand on billboards, social media, television and radio. *Id.* at 13. Suffice it to say the record supports a finding that Opposer's LA MONTERRATINA brand is well known in Venezuela.

[48]   *See* 30 TTABVUE 25-27. A PowerPoint presentation created by Opposer cites data estimating that, as of 2019, there are over half a million people from Venezuela living in the U.S., with the two largest concentrations in South Florida and in the Orlando, Florida, area. *See* 26 TTABVUE 133-34. Applicant does not contest these estimates.

further testified that Applicant's retail customer Meat Club Market likely has Venezuelan customers due to its location in El Doral, FL.[49] He acknowledged further that Meat Town, another El Doral store,[50] offers a variety of Venezuelan products.[51] He identified Holpeca and Broward Meat Market as other Florida stores that have purchased Applicant's LA MONTSERRATINA products[52] and conceded that Holpeca, too, offers Venezuelan products.[53] Both Meat Town and Holpeca advertise Venezuelan products on their respective websites.[54]

With that background, we turn now to the ways Applicant has copied Opposer's mark and packaging. Here is how, since 2013, Opposer presents the mark in advertising and on its goods:

 [55]

Below is the first (of two) labels Applicant used:

---

[49] *See id.* at 58-59.

[50] *See id.* at 151-53.

[51] *See id.* at 64.

[52] *See id.* at 27.

[53] *See id.* at 66.

[54] *See id.* at 133-39 (Exhs. 5, 7 to 30(b)(6) deposition (Holteca and Meat Town website excerpts)).

[55] *See, e.g.*, 26 TTABVUE 3-4 (Madsen testimony); *id.* at 31-53 (Opposer's catalog).



[56]

The similarities are striking. In both, the word "la" is in all lower case, with the letters "l" and "a" directly above the letters "o" and "n," respectively. The size of the capital "M" relative the remaining lower-case letters appears to be nearly identical. Both logos are partially underscored with an orange-hued arc extending from underneath the "M" to the end of the second "r" in Montserratina. To be sure, there are some small differences. The word "Montserratina" is linear in Opposer's logo, but slightly curved in Applicant's. The typefaces themselves, though very similar, are not identical.[57] Still, the similarities are inescapable and could not be considered coincidental.

At some point thereafter, Applicant modified the logo, changing the typeface, making the words appear in linear rather than slightly curved fashion, and

---

[56]  *See* 30 TTABVUE 80-81 (Pereira testimony) & 159 (exhibit in question).

[57]  These differences are quite subtle and are likely to pass unnoticed by U.S. consumers with memories of Opposer's brand in Venezuela. Trademark law has long taken into account that consumers depend on their recollections of brands they have previously seen—as opposed to side-by-side comparisons—in perceiving brands currently in front of them. *See, e.g.*, *Joseph Schlitz Brewing Co. v. Houston Ice & Brewing Co.*, 250 U.S. 28, 30 (1919) ("Beyond stating the principles to be applied there is little to be said except to compare the impression made by the two, or, if that form of statement is preferred, the memory of Schlitz with the presence of the defendant's bottles as marked."); *Franklin Mint Corp. v. Master Mfg. Co.*, 667 F.2d 1005, 1007 (CCPA 1981) ("Those who comprise the purchasing public for these goods ordinarily must depend upon their past recollection of marks to which they were previously exposed.") (citation omitted).

eliminating the orange arc.[58] Mr. Pereira attached a copy of the modified label to his testimony declaration:



[59]

This modified logo corresponds to the drawing in the challenged application and is an **exact** copy of the precise typeface and layout of the words in Opposer's logo.

Applicant's copying did not stop there. Applicant's package labels are similar to Opposer's package labels. One of Opposer's sausage packages and one of Applicant's are depicted below:

---

[58]    *See id.* at 84-85.

[59]    *See* 35 TTABVUE 8-9. The modified logo is identical to the drawing in the challenged application. The specimens Applicant submitted along with its application, however, appear to use the first iteration of the logo Applicant designed.

 (Opposer's)[60]     (Applicant's).[61]

The label layouts are quite similar. At the top of both are the identical names LA MONTSERRATINA, with the words laid out identically, using identical typefaces in white print on a black, roughly rectangular-shaped background. Underneath that are yellow/orange rectangular strips providing the background for the name of the particular meat product. Underneath that are rectangular strips bearing a photo of the product in a "serving suggestion"-type manner. Finally, on the bottom-most part of the labels, the nutritional, manufacturing, and other details appear in fine print on similar brass or gold-ish backing. While side-by-side comparison reveals that Applicant's labels have a few small differences, they do not strike us as the kind of details that consumers familiar with Opposer's product would recall with any clarity, if at all.

---

[60]    *See* 26 TTABVUE 4.

[61]    *See* 26 TTABVUE 23; *see also* 47 TTABVUE 12 (showing another label with LA MONTSERRATINA in the original, now-replaced, typeface).

Mr. Pereira gamely insisted that he picked the name LA MONTSERRATINA because he "liked" it, especially the way he thinks U.S. consumers would pronounce it.[62] We find this testimony not credible, insofar as Mr. Pereira intended to suggest there was no copying. First, he admitted that he and his business partner (and his business partner's wife) all were familiar with Opposer's mark from decades of living in Venezuela. Second, Applicant followed up the allegedly-innocent picking of the name by choosing a typeface and visual presentation quite similar to Opposer's. It then moved even closer by changing from a typeface style that wasn't just similar, but now is identical, to Opposer's. Third, Applicant adopted packaging that is hard to differentiate from Opposer's unless the two are side-by-side—which U.S. consumers cannot do because Opposer's products are not available in the U.S. And fourth, Applicant sells the products at issue to stores with a Venezuelan connection.

Applicant points out that Applicant's USA Ham logo, address, and "MADE IN USA" appear on the package.[63] We rejected a similar attempted excuse in *Bayer Consumer Care AG v. Belmora LLC*, No. 92047741, 2014 WL 1679146, at \*13 (TTAB 2014), *aff'd*, 338 F. Supp. 3d 477 (E.D. Va. 2018), *aff'd in relevant part, vacated and remanded on other grounds*, 987 F.3d 284 (4th Cir. 2021) ("*Belmora*"). Here, similar to the circumstances in *Belmora*, Applicant's logo is smaller than the main mark LA MONTSERRATINA, and even in conjunction with the "MADE IN USA" statement, we think, as we did in *Belmora*, that U.S. consumers familiar with Opposer's

---

[62] *See* 30 TTABVUE 35-36, 37-38, 39-40, 41, 47-48; 35 TTABVUE 9.

[63] *See* 47 TTABVUE 12-14.

reputation who actually noticed the smaller USA HAM logo would simply think that Applicant is Opposer's U.S.-based affiliate or licensee. *See Belmora*, 2014 WL 1679146, at *12; *see also* 3 MCCARTHY § 23:43 (addition of the defendant's house mark "may merely suggest to customers that plaintiff has licensed defendant or that the parties are affiliated in some other way"). In any event, we need not guess at the effect of the USA Ham logo: it plainly is not working as a confusion-avoidance mechanism because there already has been confusion.

In sum, it beggars belief to view the copying here as having nothing to do with Opposer's reputation within the U.S. We find instead that, in the totality of the circumstances here, Applicant's copying clearly reflects a calculated, multi-faceted attempt to capitalize on Opposer's reputation for its LA MONTSERRATINA-branded meat products with at least some U.S. consumers. To reiterate, Opposer's copying is confirmatory evidence of Opposer's reputation within the U.S.

4. Proof of negative consumer experiences with a defendant's product is not required to show reputational damage to a plaintiff

Applicant argues that there can be no reputational injury unless there is evidence that consumers have had "negative experiences" with its products and associate those negative experiences with Opposer.[64] This reflects too stingy a view of the kinds of commercial injuries against which Section 14(3) is designed to protect. As Opposer points out in reply, one of the key assets the Act protects is the mark owner's ability to control its reputation, which is uniquely symbolized by the mark. When an

---

[64] *See* 47 TTABVUE 21-22.

unrelated party uses the mark so as to misrepresent or cause confusion or mistake as to source, that control is lost, leaving the original owner's reputation to the whim of an unrelated third party, to the detriment of the mark owner.[65] *See, e.g., Y.Y.G.M. SA v. Redbubble, Inc.*, 75 F.4th 995, 1006-07 (9th Cir. 2023) (loss of control is a type of irreparable harm protected by the Lanham Act), *cert. denied*, 144 S. Ct. 824 (2024); *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 382 (6th Cir. 2006) ("the harm [from confusion as to source] stems not from the actual quality of the goods (which is legally irrelevant) but rather from Lorillard's loss of control over the quality of goods that bear its marks") (citation omitted); *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1091 (7th Cir. 1988) ("the owner of a mark is damaged by a later use of a similar mark which place[s] the owner's reputation beyond its control, though no loss in business is shown."); *Coach / Braunsdorf Affinity, Inc. v. 12 Interactive, LLC*, No. 92051006, 2014 WL 1390528, at \*26 (TTAB 2014) (actual confusion reflects damage in several forms, including "loss of control over reputation").

### 5. That Opposer's future U.S. expansion plans are allegedly "nebulous" is irrelevant to whether its reputation extends to the U.S.

Borrowing an adjective from *Meenaxi*, Applicant repeatedly characterizes Opposer's plans to enter the U.S. market as "nebulous," arguing that, without something more concrete than "nebulous" plans, Opposer can demonstrate neither

---

[65] *See* 48 TTABVUE 12 (quoting *El Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir. 1986)).

statutory entitlement nor a cause of action under Section 14(3). In particular, Applicant argues that Mr. Madsen's testimony that Opposer has been seeking, and continues to seek, licensing or co-packing partners in the U.S. and Opposer's filing of intent-to-use applications with the USPTO is too generalized to satisfy statutory entitlement as set forth in *Meenaxi*.[66] We disagree.

The *Meenaxi* Court's discussion of the foreign plaintiff's business plans for the United States took place in the context of whether the plaintiff had established lost sales. *See* 38 F.4th at 1076. But lost sales is one of the two ways discussed in *Meenaxi* that an opposer can show damage from alleged violations of Section 14(3). The other is damage to its reputation. *See id.* at 1072. Here, Opposer does not allege lost sales as the basis for its Section 14(3) claim nor as the basis for its entitlement to file a statutory opposition claim. Rather, it alleges only damage to its reputation in the U.S.[67] Thus, the details of its plans for commercial expansion into the U.S. are not required to show damage.

Moreover, as detailed above, the evidence here shows that Opposer's reputation as reflected in its LA MONTSERRATINA mark does indeed extend to the United States, unlike the reputation of the Indian brands asserted by the plaintiff in *Meenaxi*. In particular, its reputation here is reflected by evidence of U.S. consumers contacting Opposer about availability of its products here, the confusion exhibited by

---

[66]    *See* 47 TTABVUE 20, 23, 31.

[67]    *See* 46 TTABVUE 37 ("Despite the absence of actual sales of its LA MONTSERRATINA goods in the United States, Plumrose has produced … evidence that it has an established reputation here.").

several U.S. consumers upon encountering Applicant's LA MONTSERRATINA products and by at least two stores to whom Applicant sells, as well as the detailed acts of copying in which Applicant engaged, which, in the circumstances presented here, confirm that extension of reputation. The extension of Opposer's reputation to the U.S. is not dependent on its intent-to-use applications or future business plans. In any event, as discussed below, Applicant's application has already caused harm by blocking Opposer's registration.

### 6. Conclusion: Opposer has demonstrated reputational injury within the U.S.

We find that Opposer has established that its reputation through the LA MONTSERRATINA brand extends to U.S. consumers and that Applicant's challenged activity is harming Opposer's reputation by hijacking control of that reputation. We recognize the cases discussing loss of control as a commercial harm by itself typically involve plaintiffs selling products in the U.S. market. However, the harm generated by loss of control over one's reputation falls within the purview of the Lanham Act. Section 45, 15 U.S.C. § 1127, provides that the "intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce" and "to protect persons engaged in such commerce against unfair competition." Misrepresentation of source is "deceptive and misleading use" and, as this record shows, the deception caused by misleading use of marks about which Congress is concerned may occur even when the source is not yet using the mark in the U.S. but its commercial reputation extends to the U.S.

Put another way, in no way can this case be said to be "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *Corcamore*, 978 F.3d at 1305. Here, the evidence shows that U.S. consumers know and recognize Opposer's mark and associate it with Opposer as the source when encountering Applicant's products. When they are misled into thinking that Opposer is the source, Opposer's reputation is harmed by the loss of control over its reputation and this constitutes damage under Sections 13 and 14. Thus, Opposer falls within the zone of interests protected by the opposition statute and has demonstrated proximate causation. Opposer is statutorily entitled to oppose registration of Applicant's marks under Section 14(3).

### B. Statutory entitlement based on suspension of Opposer's applications

In addition to reputational harm, Opposer alleged in its Notice of Opposition that it filed the '915 and '932 Applications[68] for its LA MONTSERRATINA marks and, at trial, it made those applications of record.[69] It also showed that these two applications received Office actions under Section 1208.02(a) of the TRADEMARK MANUAL OF EXAMINING PROCEDURE (TMEP) (May 2024), informing Opposer that, should Applicant receive its registration, Opposer's applications may be refused due to a likelihood of confusion in view of Applicant's earlier-filed application.[70] Opposer has

---

[68]    *See* 1 TTABVUE 5.

[69]    *See* 26 TTABVUE 56-57, 63-64.

[70]    *See* 26 TTABVUE at 55-62, 63-70.

made those Office actions of record as well.[71] Together, Opposer's commercial interest in these applications and the fact that the pendency of Applicant's application has thwarted those applications show that Opposer has a reasonable belief in damage proximately caused by the registration of the mark in Applicant's application. *See, e.g., Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 1274 (Fed. Cir. 2014) (even though plaintiff could not, under current U.S. regulations, lawfully sell its goods in U.S., court held that it was statutorily entitled to petition to cancel two registrations that were the basis of the USPTO's refusal to register its mark for such goods); *Life Zone Inc. v. Middleman Grp. Inc.*, No. 91160999, 2008 WL 2781162, at *6 (TTAB 2008) (suspension of opposer's pending trademark application based on the applicant's application sufficient); *see also Lipton Indus. Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 1029 (CCPA 1982) ("rejection of [the plaintiff's] application during prosecution" in light of defendant's registration sufficient to invoke cancellation proceeding). Accordingly, the suspension of Opposer's applications in view of Applicant's prior-pending application independently statutorily entitles Opposer to file this proceeding.[72]

---

[71] *See* 26 TTABVUE 58-61, 65-69. Trademark Rule 2.83, 37 C.F.R. § 2.83, provides that if, as happened here, the earlier-filed application (here, Applicant's) is published for opposition, then the later-filed applications (here, Opposer's) must be suspended until the published application either is registered (at which point the later-filed applications will be refused) or abandoned (at which point the later-filed applications will proceed). Applicant's brief acknowledges that Opposer's applications both stand suspended. *See* 47 TTABVUE 16.

[72] Applicant's trial brief does not assert that Opposer's applications are invalid. Where an opposer's substantive claim depends on the validity of its asserted intent-to-use application, we have entertained defenses based on the alleged invalidity of the application. *See, e.g., Salacuse v. Ginger Spirits Inc.*, No. 92024813, 1997 WL 687374, at *3-4 (TTAB 1997) (where plaintiff relies on intent-to-use applications to prove priority in a Section 2(d) claim and defendant both pleads and pursues a defense that the applications are invalid, the Board

III.   The merits of Opposer's Section 14(3) claim

Having determined that Opposer is entitled to invoke the opposition statute, we turn to the merits of Opposer's claim under Section 14(3) of the Trademark Act, 15 U.S.C. § 1064(3). As will be seen, our detailed findings as to the injury to Opposer's reputation go a long way toward demonstrating a violation of Section 14(3).

Section 14(3) provides, in pertinent part:

> A petition to cancel a registration of a mark … may … be filed … by any person who believes that he is or will be damaged … [a]t any time … if the registered mark is being used by … the registrant so as to misrepresent the source of the goods or services on or in connection with which the mark is used.[73]

There are three elements to a Section 14(3) claim:

> (1) present use of the challenged mark by the defendant; (2) specific acts or conduct by the defendant that are deliberately aimed at passing-off its goods as those of the plaintiff; and (3) the nature of the injury to plaintiff as a result of defendant's deliberate conduct (i.e. damage to reputation or lost sales).

---

may address the validity of the applications). Here, however, Applicant's trial brief mentions the applications in passing, and only in connection with its argument that statutory entitlement is lacking due in part to Opposer's U.S. business plans being "nebulous." As we found *supra*, however, that argument fails to grapple with the facts that (1) *Meenaxi* addressed Coca-Cola's "nebulous" U.S. business plans for the two brands only in the discussion of lost sales-related damages, and Opposer here is not asserting lost sales as its basis for entitlement to oppose registration, and (2) Opposer's reputation already extends to the U.S.

[73]   Although the text of Section 14 is directed to petitions to cancel registrations, we have held that it may apply to oppositions to applications, including where, as here, the opposer alleges that the applicant has made use of the mark in the proscribed fashion. *See PepsiCo, Inc. v. Arriera Foods LLC*, No. 91269057, 2022 WL 15328405, at *4 (TTAB 2022). Applicant does not argue that the Section 14(3) claim here does not apply to this opposition proceeding.

*PepsiCo*, 2022 WL 15328405, at *7 (citations omitted). Elements (2) & (3) coincide with the findings we made in the preceding section concerning Opposer's entitlement to invoke the opposition statute to pursue its claim under Section 14(3). In *Meenaxi*, for example, the Court determined that the plaintiff's failure to prove damage to its U.S. reputation scotched not only its claim of statutory entitlement to seek cancellation, but also its "cause of action under § 14(3) of the Lanham Act." 38 F.4th at 1079. Conversely, demonstration of damage to reputation not only demonstrates entitlement to file an opposition proceeding against the party allegedly responsible for that damage, it also establishes element (3) of a Section 14(3) claim. Independently, the blocking of Opposer's pending applications also establishes an injury to Opposer due to Applicant's deliberate conduct.

As to element (2), our discussion in the preceding section also detailed the specific acts taken by Applicant deliberately aimed at passing off its goods, i.e.: adopting Opposer's mark; presenting the two words in the same layout; initially adopting a similar typeface and then changing to the identical typeface; adopting a packaging label mimicking Opposer's; selling its LA MONTSERRATINA products to stores that sell other Venezuelan products and/or count Venezuelan-Americans among their customers who, like Applicant, know Opposer's brand; and continuing this conduct when the record shows Applicant knew one of its retailer customers thought it was the brand from Venezuela. Thus, our findings above concerning Applicant's copying and conduct also have established element (2) of a Section 14(3) claim. *See, e.g.*, *PepsiCo*, 2022 WL 91269057, at *8 (listing the defendant's copying of the plaintiff's

display of the mark or product packaging as examples of specific acts or conduct designed to deliberately pass off the defendant's goods as those of the plaintiff); *E.E. Dickinson Co. v. T.N. Dickinson Co.*, No. 92013668, 1984 WL 63740, at *3 (TTAB 1984) (pleading that defendant's label presentation and portrayal of mark "colorably imitate and appropriate" plaintiff's mark).

Finally, there is no dispute in this case that element (1) is satisfied here. As detailed above, Applicant has been selling LA MONTSERRATINA-branded meat products since the end of 2020, and Applicant's trial brief acknowledges that Applicant currently sells packaged meat products under the LA MONTSERRATINA marks.[74]

Opposer thus has established all three elements of its Section 14(3) claim.

**Decision:** For the reasons set forth above, we sustain this opposition.

---

[74] *See, e.g.*, 47 TTABVUE 10, 12; *see also* 28 TTABVUE 14, 16, 26-28, 55-56 (Applicant's interrogatory responses affirming that Applicant has sold meat products under the mark in its application). As we pointed out *supra*, n.1, Applicant, on June 11, 2021, amended the subject application to allege use as of December 1, 2020.